# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE: | . | Case No. 11-23212 (RDD) |
| RUSTY HAYNES and<br>BERNADETTE GATTLING-HAYNES, | . | Chapter 7 |
| Debtors. | . | |
| . . . . . . . . . . . . . . . . | . | |
| RUSTY HAYNES and<br>BERNADETTE GATTLING HAYNES, | . | Adv. Proc. 13-08370 (RDD) |
| Plaintiffs, | . | |
| v. | . | |
| CHASE BANK U.S.A., N.A., | . | |
| Defendant. | . | |
| . . . . . . . . . . . . . . . . | . | |
| IN RE: | . | Case No.  14-22147 (RDD) |
| ORRIN S. ANDERSON, | . | Chapter 7 |
| Debtor. | . | |
| . . . . . . . . . . . . . . . . | . | |
| ORRIN S. ANDERSON, | . | Adv. Proc. 15-08214 (RDD) |
| Plaintiff, | . | |
| v. | . | |
| CREDIT ONE BANK, N.A. et al, | . | |
| Defendants. | . | |
| . . . . . . . . . . . . . . . . | . | |
| IN RE: | . | Case No. 13-22088 (RDD) |
| KIMBERLY BRUCE, | . | Chapter 7 |
| Debtor. | . | |
| . . . . . . . . . . . . . . . . | . | |
| KIMBERLY BRUCE, | . | Adv. Proc. 14-08224 (RDD) |
| Plaintiff, | . | |
| v. | . | |
| CITIGROUP INC., CITIBANK, N.A.,<br>CITIBANK (SOUTH DAKOTA), N.A., | . | |
| Defendants. | . | |
| . . . . . . . . . . . . . . . . | . | |

2

```
IN RE:                              .  Case No. 13-22693 (RDD)
                                    .
MICHAEL ECHEVARRIA,                 .  Chapter 7
                                    .
                Debtor.             .
. . . . . . . . . . . . . . . . . . .
MICHAEL ECHEVARRIA,                 .  Adv. Proc. 14-08216 (RDD)
                                    .
                Plaintiff,          .
      v.                            .  300 Quarropas Street
                                    .  White Plains, NY  10601
BANK OF AMERICA CORPORATION, et al.
                                    .  Tuesday, May 5, 2015
                Defendants.         .  11:04 a.m.
. . . . . . . . . . . . . . . . . . .
```

TRANSCRIPT OF STATUS CONFERENCE;
PRE-TRIAL CONFERENCE;
MOTION TO DISMISS ADVERSARY PROCEEDING, TO COMPEL
ARBITRATION, TO STRIKE CLASS ALLEGATIONS, TO STAY PROCEEDINGS
**BEFORE THE HONORABLE ROBERT D. DRAIN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:
For the Plaintiff:          Boies Schiller & Flexner, LLP
                            By:  GEORGE CARPINELLO, ESQ.
                                 ADAM R. SHAW, ESQ.
                            30 South Pearl Street
                            Albany, NY 12207
                            (518) 434-0600

                            Charles Juntikka & Associates LLP
                            By:  CHARLES W. JUNTIKKA, ESQ.
                            1250 Broadway, 24th Floor
                            New York, NY  10001
                            (212) 315-3755

APPEARANCES CONTINUED

Audio Operator:             Claire Logue Togher, ECRO

Transcription Company:      Access Transcripts, LLC
                            517 Dell Road
                            Landing, NJ  07850
                            (855) 873-2223
                            www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**WWW.ACCESSTRANSCRIPTS.COM**

3

APPEARANCES (Cont'd):

For the U.S. Trustee:      Office of The United States Trustee
                           By:  GREG M. ZIPES, ESQ.
                                LISA D. TINGUE, ESQ. (Telephonic)
                           201 Varick Street, Suite 1006
                           New York, NY 10014
                           (212) 510-0500

For Chase Bank U.S.A.:     Wilmer, Cutler, Pickering,
                            Hale & Dorr, LLP
                           By:  NOAH A. LEVINE, ESQ.
                           7 World Trade Center
                           250 Greenwich Street
                           New York, NY  10007
                           (212) 230-8800

For Bank of America:       Reed Smith, LLP
                           By:  MARY J. HACKETT, ESQ.
                           225 Fifth Avenue, Suite 1200
                           Pittsburgh, PA  15222
                           (412) 478-9824

For Citigroup Inc.,
Citibank, N.A.,
Citibank (South
Dakota), N.A.:             Sidley Austin, LLP
                           By:  BENJAMIN R. NAGIN, ESQ.
                                JON W. MUENZ, ESQ.
                           787 Seventh Avenue
                           New York, NY  10019
                           (212) 839-5911

TELEPHONIC APPEARANCES:

For Credit One Bank:       Sessions Fishman Nathan & Israel, LLC
                           By:  MICHAEL D. SLODOV, ESQ.
                           15 East Summit Street
                           Chagrin Falls, Ohio 44022
                           (440) 318-1073

**WWW.ACCESSTRANSCRIPTS.COM**

1     (Proceedings commence at 11:04 a.m.)

2          THE COURT:  Okay.  In Re Echevarria and In Re

3     Anderson, and then I guess we'd have status conferences in

4     Haynes and Bruce.  Why don't we do the discovery issues first,

5     and then we'll do the substantive motion in Anderson last.

6          MR. CARPINELLO:  Judge, George Carpinello.  With

7     regard to the scheduling order -- may I begin?

8          THE COURT:  Sure.

9          MR. CARPINELLO:  With regard to the scheduling order

10    with Haynes and -- the Haynes case and the Echevarria case, we

11    did -- I think we reached agreement.  I wasn't sure.  I got

12    word from Chase that they were agreeable to the dates.  I

13    haven't heard from Bank of America, where they were -- it was

14    one date we had disputed.

15         THE COURT:  Was this a discovery cutoff date or what

16    --

17         MR. CARPINELLO:  It was a -- it was the end of -- the

18    discovery cutoff date.  We wanted October 30th because the

19    Echevarria case has been pending for quite a long time, as has

20    the Haynes case.  And I think Chase had finally agreed to

21    October 30th.  Bank of America said they wanted December 31.

22         MS. HACKETT:  Your Honor, I sent an email this

23    morning.  I think Mr. Carpinello may have been in transit.

24         THE COURT:  Okay.

25         MS. HACKETT:  We're in agreement.

1          THE COURT:  We're on October --

2          MR. CARPINELLO:  30th.

3          THE COURT:  What is that, October 30th?

4          MS. HACKETT:  Yes, Your Honor.

5          THE COURT:  Okay, fine.

6          MR. CARPINELLO:  Should I hand it up, Judge, or do

7    you want to --

8          THE COURT:  No, you need to email it to me.

9          MR. CARPINELLO:  Okay.

10          THE COURT:  It's my standard form of pretrial order.

11          MR. CARPINELLO:  Oh, I didn't email it yet because I

12   wanted to make sure --

13          THE COURT:  No, but that's what it -- that's the form

14   it should be in.  It runs off of the discovery cutoff date, and

15   you should get a pretrial conference date from Mr. Andino in

16   the clerk's office, but he's on vacation, for the final

17   pretrial conference.

18          MR. CARPINELLO:  Should we have in the order a trial

19   date?  Because we don't have a trial date.

20          THE COURT:  No.  I -- no, although you can reserve

21   one.  It's probably a good idea to reserve one.  But the

22   standard form doesn't -- normally doesn't have a trial date, it

23   just has a final pretrial -- it says you should be ready for

24   trial within a few weeks of completing discovery.

25          MR. CARPINELLO:  I did want to raise one issue just

1  to make sure we don't run --

2          THE COURT:  So just to be -- are we all clear on

3  that, on the form of it?

4          MR. LEVINE:  Your Honor, I'm Noah Levine for Chase.

5  I think the only issue that we all tried to deal with the

6  order, and maybe Mr. Carpinello can address it, that since this

7  was brought as a class case, we had provided in this order so

8  that there would be an opportunity for the parties to meet and

9  confer about when that would be briefed.  So --

10         THE COURT:  That's fine.

11         MR. LEVINE:  -- if there's still a pretrial

12  conference with that, we're fine --

13         THE COURT:  That's fine.

14         MR. LEVINE:  -- with that, of course, Your Honor.

15         THE COURT:  And as far as the -- my standard form of

16  pretrial order recognizes that after the close of the

17  discovery, people sometimes move for summary judgment.  They've

18  been known to do that, and obviously at that stage, we won't be

19  proceeding with trial.  You'll get a hearing date for the

20  summary judge -- a summary judgment motion.  And similarly, if

21  there are -- if there is to be litigation or a class

22  certification, obviously there will be room in the order for

23  that, too.  But you should first provide for the meet and

24  confer so you can talk about that.  That's fine.

25         MS. HACKETT:  Your Honor, Mary Hackett for the

1  defendants.  I think I can short-circuit another issue.  We

2  were here on a motion to amend request for admission.

3          THE COURT:  Right.

4          MS. HACKETT:  The plaintiffs provided an order

5  yesterday.  We are agreeable to the entry of that order.

6          THE COURT:  Okay.  All right.  Very well.

7          MR. NAGIN:  Your Honor, Benjamin Nagin for Citi.  The

8  dates in the proposed order are fine with us, as well.

9          THE COURT:  Okay.

10         MR. NAGIN:  As a side note to that, we've been in

11 discussions with plaintiff's counsel regarding the -- an entry

12 of an order with respect to conditions for a stay.

13         THE COURT:  Okay.

14         MR. NAGIN:  And we've gotten some feedback, and

15 hopefully we'll have something for the Court in short order on

16 that.

17         THE COURT:  Okay.

18         You're nodding.  Is that your understanding, too?

19         MR. CARPINELLO:  Yes, we had a discussion.

20         THE COURT:  All right.

21         MR. CARPINELLO:  I think we will reach agreement.

22 Just to refresh Your Honor's recollection --

23         THE COURT:  Right.  There was an agreement earlier,

24 and so I entered an order denying the request for a stay, but

25 obviously I made it clear that if it was along the lines of

1  what had been agreed to by the --

2              MR. NAGIN:  GE.

3              THE COURT:  -- by GE, then I would grant the stay.

4              MR. CARPINELLO:  And that's the issue we're

5  discussing is --

6              THE COURT:  Okay.

7              MR. CARPINELLO:  -- the conformity with --

8              THE COURT:  Okay.

9              MR. CARPINELLO:  -- the GE order.

10             THE COURT:  That's fine.

11             MR. NAGIN:  Okay.  Thank you, Your Honor.

12             THE COURT:  Okay.  So --

13             MR. LEVINE:  Your Honor, if I may, one more issue for

14 Chase.  We wanted to let the Court know that, you know, Chase

15 is -- we have a commitment to the Court, heard your rulings

16 over the last year, and Chase has sold non-bankruptcy charged-

17 off debt.  Last time it sold, it was in 2012 on this debt.

18             As for that sold debt, we've seen what's happened

19 with the GE orders, with the Citi orders, et cetera.  We don't

20 have a motion for arbitration.  We just want to let the Court

21 know that within the next three months, so that means by August

22 5th, for accounts that have a Chapter 7 discharge, we're going

23 to do one or the other of what's in the GE order, which means

24 that we will either, if it is possible, have the -- we will

25 report the trade lines as included in bankruptcy and delete any

1 negative information or we will delete the trade lines.

2          We don't know whether or not we will be or when we

3 will be selling debt again.  If we do, it won't be before the

4 first quarter of 2016, and if that's the case, absent any

5 further regulatory guidance or anything like that that

6 instructs us to do otherwise, we will also follow one of those

7 two options going forward.

8          THE COURT:  Okay.  I appreciate that.

9          MS. HACKETT:  Your Honor --

10          MR. CARPINELLO:  So I just need a --

11          THE COURT:  Well, as far as -- given what was just

12 stated -- I mean, obviously it needs to be implemented.  You

13 all ought to think about your trial schedule.  I mean, it's a

14 very different set of issues at that point.

15          MR. CARPINELLO:  We still have the issue of --

16          THE COURT:  No, I understand, but it's a different

17 set of issues.

18          MR. CARPINELLO:  Right.  I mean, I -- that's what I

19 was going to raise.  Is this a consent to an injunction or -- I

20 mean, because they don't have an appeal.  The other parties

21 have said we're going to do --

22          THE COURT:  Well, it hasn't been implemented yet.

23 They want to -- but I'm aware of that.  I appreciate it being

24 raised, and both sides should talk about that process and how

25 it affects the trial.

1          MS. HACKETT:  And Your Honor, may I add for Bank of

2   America, we will also be deleting or suppressing the trade

3   lines --

4          THE COURT:  Okay.

5          MS. HACKETT:  -- over the next 90 days.  We will be

6   doing so for all accounts that the bank has sold since May

7   2007.

8          THE COURT:  Okay.

9          MS. HACKETT:  This remedies any issue that if any

10  accounts -- even though the bank is not currently selling

11  credit card accounts, but it remedies the issue should a

12  previously-sold credit card account go through a bankruptcy

13  discharge, that trade line will already be deleted.

14         THE COURT:  Okay.

15         MS. HACKETT:  We wanted to assure you that we heard

16  you and we had no financial incentive at all with the trade

17  lines, but we understand your concerns and we will be deleting

18  or suppressing for all credit card sold accounts since May

19  2007.

20         THE COURT:  Okay.  All right.  So again,

21  Mr. Carpinello, same type of discussion I think you should have

22  with B of A's counsel.

23         MR. CARPINELLO:  I'm sorry, Your Honor.  Co-counsel

24  was talking.

25         THE COURT:  I'm just saying same thing.  My same

1  instruction to you with regard to Chase is implementation of

2  the issues you also have with B of A's counsel and see if we

3  can narrow down or resolve the issues for trial.

4          MR. CARPINELLO:  Understood, Your Honor.

5          THE COURT:  Okay.  All right.  Very well.

6          MS. HACKETT:  Thank you.

7          MR. LEVINE:  Thank you, Your Honor.

8          MR. CARPINELLO:  Thank you.

9          THE COURT:  Okay.  I don't know, should we do the

10  U.S. Trustee point first?  I think it's maybe worthwhile to do

11  that.

12          MR. CARPINELLO:  We have the Credit One motion.

13          THE COURT:  No, I understand, but that's going to

14  take --

15          MR. CARPINELLO:  Okay.

16          THE COURT:  -- longer.  I wanted to get through the

17  one that -- the more procedural aspects first.

18          MR. ZIPES:  Your Honor, Greg --

19          THE COURT:  Do I -- and I'm sorry.  Do I have people

20  on the phone for this for Credit One or are they here?

21          MR. SLODOV:  (Telephonically)  Your Honor, Michael

22  Slodov.  Michael Slodov for Credit One.

23          THE COURT:  Good morning.

24          MR. SLODOV:  Morning.

25          THE COURT:  Okay.  Okay.

1          MR. ZIPES:  Your Honor, Greg Zipes with the U.S.

2  Trustee's office, and we heard the new develop -- these are new

3  developments that we heard, by the way --

4          THE COURT:  Right.

5          MR. ZIPES:  -- and we'll be in discussions with the

6  banks, as well.

7          THE COURT:  Right.

8          MR. ZIPES:  Your Honor, we brought this discovery

9  issue to the Court's attention.  We have been going back and

10  forth with the banks, and maybe I should start with a very,

11  very brief overview of where we stand on discovery.  This -- as

12  this Court is aware --

13          THE COURT:  Now, this is not adversary proceeding

14  related discovery.  This is the U.S. Trustee's own 2004 -- Rule

15  2004 discovery.

16          MR. ZIPES:  Exactly, Your Honor, and I was going to

17  make that point that -- with its own set of standards with

18  respect --

19          THE COURT:  Right.

20          MR. ZIPES:  -- to discovery.  Your Honor, as this

21  Court is aware, we've entered into 2004 orders.  It was

22  consensual.  The U.S. Trustee's office was able to work out the

23  orders with the banks, as well as protective orders.  And we

24  have had hiccups along the way in terms of discovery with the

25  banks, but we've been working cooperatively.  And I would

1  include Credit One in that category, as well, in certain

2  aspects.  We have no further discovery disputes to bring to the

3  Court's attention at this time.

4          We have conducted a few examinations in the <u>Belton</u>

5  case.  We have a few more potentially scheduled.  We have not

6  otherwise conducted examinations.

7          Your Honor, with respect to Credit One, we sent a

8  letter to the Court, and I guess I need to preface this by

9  saying that we have a confidentiality order in place and Credit

10  one has stamped confidential on every single document.  So to

11  the extent I want to mention something today on the document, I

12  just leave that to the Court on how to proceed.  I was going to

13  potentially hand up a document and then refer to that document

14  --

15          THE COURT:  Okay.

16          MR. ZIPES:  -- unless --

17          THE COURT:  Have you given that to -- will Mr. Slodov

18  know what you're referring to?

19          MR. ZIPES:  He'll know what it is because it is a

20  Credit One-provided document.

21          THE COURT:  Okay.  All right.

22          MR. ZIPES:  So, Your Honor, if I can approach.  And

23  for Mr. Slodov's benefit, Credit One 52 through 55 is what I'll

24  hand up.  May I approach, Your Honor?

25          THE COURT:  Sure.

1          MR. ZIPES:  Your Honor, I guess I'm not going to even

2   mention what this document is, but Mr. Slodov knows what it is.

3   I would direct your attention to the second page, which is a

4   table of contents.

5          THE COURT:  Right.

6          MR. ZIPES:  And just turning your attention, as well,

7   to the first line there on Page 2 to Page 14.  And then if you

8   turn the page again, Your Honor, this is an example of what we

9   received.  This is the supplemental disclosure, Your Honor,

10  that Credit One sent after we sent the letter to the Court

11  asking for a discovery conference.  The original discovery

12  response was 51 pages, and 43 pages were the actual

13  forward-flow agreement.  The rest were other miscellaneous

14  documents.

15         Your Honor, I -- Page 3 is pages omitted, and you'll

16  see that this is -- the next Bates-stamped page is the policy

17  -- is the manual at Page 44.  So what's -- we can infer from

18  this that what's being deleted is Page 1 through 43.

19         THE COURT:  Well, did you get 44 through 48?

20         MR. ZIPES:  Yes, we did, Your Honor.

21         THE COURT:  Okay.  Okay.

22         MR. ZIPES:  So -- but for example -- and I want to

23  bring this to your attention.  First of all, the standard here

24  that's being articulated, and we referred to it before, the

25  omitted pages is not relevant and not reasonably calculated to

1  weigh to the discovery of admissible evidence, that is not the

2  standard for a 2004.  I'll -- Your Honor, I'll move on from

3  that, but I just note that the standard is wrong and we might

4  not be getting documents because Credit One is applying the

5  wrong discovery standard.

6        But, Your Honor, the bigger point I wanted to make

7  with this discovery is that if you look at the table of

8  contents, at least the first page, Page 2 through 13 would

9  appear to be relevant to the U.S. Trustee's inquiry here.

10 Remember, we're trying to find out what the banks' policies are

11 in connection with the sale of charged-off debt.  And this may

12 be -- it may have some answers for us, it may not, but it's

13 being held from us, and this is after the parties attempted to

14 confer.

15        So I'm giving an example of some of the problems that

16 we're running into with this.  It ultimately might be

17 information that's helpful to us and it might not be, but we're

18 running into a road block with respect to Credit One in terms

19 of getting documents.

20        Your Honor, the letter that responded -- if I can go

21 -- I don't want to take too much of the Court's time, but we

22 have the basic issue of standard that we don't -- we don't know

23 that Credit One is applying the right standard in providing us

24 with documents.  They might be applying the 7000 series and not

25 2004 standards.  And the other is if you look at Credit One's

1  response, it just -- it appears that they are not acknowledging

2  that we're entitled to pricing information.

3              If you look at their point (a) --

4              THE COURT:  The letter is -- doesn't have point (a).

5  Are you referring to the April 30th letter?

6              MR. ZIPES:  Let me tell you what letter I'm referring

7  to.

8              THE COURT:  Oh, okay.  Go ahead.

9              MR. ZIPES:  April 30th letter.

10             THE COURT:  Request number two, that one?

11             MR. ZIPES:  Yeah, request number two.

12             THE COURT:  Okay.

13             MR. ZIPES:  And you have -- little (a), I'm sorry,

14 Your Honor.

15             THE COURT:  I see it.

16             MR. ZIPES:  Whether Credit One must turn over pricing

17 information, including emails and memoranda.  We do think it's

18 relevant to get all the reasons behind why the forward-flow

19 agreements deal with pricing and whether there was some

20 discussion.

21             THE COURT:  Well, the response on this one says that

22 they read emails and memoranda as being emails and memoranda

23 between the bank and third-party purchasers as opposed to

24 general, like, within the bank, for example, emails and

25 memoranda.

1          MR. ZIPES:  And they're not the only bank, I think,

2    to read it this way, but we've been able to have dialogue with

3    the banks, and I think we're getting -- my understanding is

4    that we're getting those -- the information --

5          THE COURT:  Well, I did not parse your document

6    request, but you certainly would be entitled to request such

7    documents.  So if they want to put you through the task of

8    doing another 2004, I guess you could do that, but I -- you

9    know, I'd sign it because I -- that's certainly supported by

10   2004.

11         MR. ZIPES:  And that's helpful, Your Honor.  I think

12   that --

13         THE COURT:  You know, internal emails and memoranda

14   obviously, to me, are relevant and there's cause to produce it

15   under Rule 2004.

16         MR. ZIPES:  And, Your Honor, if --

17         THE COURT:  Or emails with, you know, not only actual

18   third-party purchasers, but others, you know, who didn't win

19   the bid.  With anyone, in other words.

20         MR. ZIPES:  This is helpful, Your Honor, and this is

21   one of the -- this has been one of our sticking points, and I

22   think this will help the parties to establish when they should

23   be turned over going forward.  But, Your Honor, if you look at

24   this response, it may or may not be inconsistent.  Credit One

25   also says a document produced embodies the entire understanding

1  of the parties' respective rights and responsibilities.  So

2  that --

3          THE COURT:  Well, but that's -- again, that's -- I --

4  it may well be the case because it's a purchase agreement, but

5  on the other hand, if they're reading that to say that it

6  supercedes all other documents, that doesn't work.  You're

7  entitled to the other documents, too.  I mean --

8          MR. ZIPES:  Thank you, Your Honor.  And I don't think

9  there's any dispute here, even if you read our document request

10  as Credit One did.  Any emails between Credit One and third

11  parties, that, I think, is accompanied in the document request,

12  so --

13          THE COURT:  Well, again -- I don't have --

14          MR. SLODOV:  Your Honor, could I respond --

15          THE COURT:  I don't have the full request in front of

16  me, so I can't comment on that, but all I can say is if you

17  said we really need everybody as opposed to just the purchaser,

18  then obviously that type of discovery under Rule 2004 is

19  warranted.

20          MR. ZIPES:  Thank you.  And we do have a copy of

21  that, Your Honor.  I think it was attached to our original

22  letter.  Let me move on quickly, Your Honor.

23          THE COURT:  Well, I don't know -- Mr. Slodov, I don't

24  know if you want to respond on that.  We're going to go through

25  these in order, so this is the one dealing with request number

1  two.

2         MR. SLODOV:  Sure, Your Honor.  Can I back up a step,

3  talking about the supplemental document production that

4  Mr. Zipes referred to?  The table of contents, as he pointed

5  out, Credit One document Page 53, it's indicated that, you

6  know, we did redact the material in between Page 2 and 44, 44

7  being the pertinent part of the policy concerning the Fair

8  Credit Reporting Act, and I'm certain that that was the

9  request, and redaction, as he indicated, says that it was

10 irrelevant.

11        I think I heard you say that with respect to the

12 other part, document request two, that those -- that you had

13 ordered production of relevant documents.

14        THE COURT:  No.  I -- look, it would even meet the

15 requirements under Rule 7004, but it's really -- cause is

16 broader under 2004.  And --

17        MR. SLODOV:  I understand that, Your Honor, but they

18 have to be somewhat relevant, right?

19        THE COURT:  Well, compliance policy, compliance

20 program, if they say -- you know, if it says something about

21 how the bank is supposed to comply with policy generally, to

22 me, that -- I think that's within the scope.  I doubt that

23 Office of Foreign Assets Control would be, and I don't think

24 the U.S. Trustee is seeking that.  I don't know whether you

25 provided everything through, you know, Page 90, but maybe

1  privacy and consumer financial information might -- you know, I

2  think the trustee's generally pretty reasonable about this.  I

3  doubt that they would, you know -- I got from Mr. Zipes that

4  what he was looking for was 2 through 14 and maybe, you know,

5  53 through 60.  I don't know if there's anything else that he's

6  legitimately looking for in that -- the -- this whatever it's

7  called, the manual.

8           MR. SLODOV:  Supplement.  Well, Your Honor, this is

9  the first that I'm hearing that Mr. Zipes was dissatisfied or

10 had any question about or was interested in seeing additional

11 pages.

12          THE COURT:  Okay.

13          MR. SLODOV:  This material was provided on April

14 30th.  It came to me late, which is what I pointed out in my

15 letter.

16          THE COURT:  Yeah, I don't --

17          MR. SLODOV:  I --

18          THE COURT:  I -- that's fine.  And -- but anyway, I

19 think that's probably enough said on this document, this

20 manual.

21          MR. SLODOV:  Okay.  And with respect to request two,

22 going back to the April 3rd [sic] --

23          THE COURT:  Right.

24          MR. SLODOV:  -- 30th letter, point (a), there were

25 two parts to this, the way I read Mr. Zipes's letter.  The

1 first related to the pricing information, the second related to

2 emails and memoranda.  And I -- now, we did confer about the

3 emails and memoranda that was being requested here, and I read

4 the request several times and it clearly is limited to emails,

5 memoranda between the bank and third-party purchasers

6 concerning respective rights and responsibilities in connection

7 with the account.  That --

8            THE COURT:  Okay.  I mean, I -- so I don't think

9 we're in disagreement here.  What I'm saying though is that if

10 the U.S. Trustee wants more, wants internal memoranda or

11 memoranda with -- emails or memoranda with third parties, not

12 just the specific third-party purchaser, like prospective

13 purchasers, you know, people internally, et cetera, regulators,

14 anyone with the rights and responsibilities in connection with

15 the account, there would be cause to produce it under Rule

16 2004.

17            MR. SLODOV:  And "the account" being the plaintiff's

18 account.

19            THE COURT:  Well --

20            MR. SLODOV:  That's the way they defined it, Your

21 Honor.  I mean --

22            THE COURT:  Well, okay.  But again, it's up to them

23 to phrase it, but the defenses here are all, as I read them --

24 one of the defenses here is that, we don't do this generally.

25 So, you know, you only have to respond to the question you're

1 asked.  I get that.  But what I'm saying is if the trustee

2 wants more in this area, he can get it.

3          MR. ZIPES:  And, Your Honor, I'll just point out that

4 even if we concede that it's only between the bank and the

5 third party, we've gotten nothing in that regard anyway, so

6 we're still looking for emails --

7          THE COURT:  Well, you've got the purchase agreement

8 only.

9          MR. ZIPES:  The purchase agreement, but --

10          THE COURT:  Well --

11          MR. ZIPES:  -- no emails or the --

12          THE COURT:  Right.  No, you're -- again --

13          MR. ZIPES:  -- bid agreement or bid package or

14 anything of that nature.

15          THE COURT:  Okay.  All right.

16          MR. ZIPES:  Your Honor, if I can move on now to point

17 (b) of --

18          THE COURT:  Right.  We're dealing with request number

19 five.

20          MR. ZIPES:  Now, here, the answer is that there are

21 no documents because -- on post-charge-off accounts in this

22 situation because the account was sold.  And, Your Honor, our

23 experience is that there aren't --

24          THE COURT:  This explanation is not really a

25 document.

1          MR. ZIPES:  Right.

2          THE COURT:  Now, if there literally are no documents,

3  there are no documents, but if the -- it's really a legal

4  response saying that we don't have to do this in the first

5  place, it's not really an answer to a document request.

6          MR. ZIPES:  Right.  Your Honor, and that's our point.

7  And our experience with the other banks is that there are such

8  policies.  There might not be -- right.

9          THE COURT:  Well, whether there are or there aren't,

10  a legal response, which is basically to say this whole inquiry

11  is improper, doesn't work in my view unless, Mr. Solov [sic],

12  I'm missing something -- Slodov, I mean.

13          MR. SLODOV:  Your Honor, I have two responses.  First

14  of all, the request as it was written asked for rights and

15  responsibilities of the bank in reporting to credit reporting

16  agencies in connection with the account after the bankruptcy

17  filing date.  So as it happens, in this particular case, the

18  account was sold two years prior to the bankruptcy filing.  The

19  bankruptcy filing --

20          THE COURT:  It says concerning the respective rights

21  and responsibilities in connection with the account, so I think

22  that logically includes something more than a specific email

23  about this specific person's account.  If there's a document

24  pertaining to how you handle these accounts generally,

25  obviously this account is subsumed within those accounts.

1          MR. SLODOV:  But they defined the term account, Your

2    Honor, to be the credit card account that is listed in debtor's

3    Schedule F.

4          THE COURT:  Now, that's -- I'm sorry, that's just

5    ridiculous.  It says "with the respective rights and

6    responsibilities in connection with the account."  I doubt that

7    any banker would write individual memos or emails about every

8    5,000 or 500,000 accounts listing the account itself.

9    Obviously, you talk in terms of generalities.  That's just not

10   properly responsive.

11         MR. SLODOV:  I fail to understand, Your Honor.

12         THE COURT:  Oh, come on.

13         MR. SLODOV:  I don't mean to be dense --

14         THE COURT:  Are you serious?  Are you really serious

15   you don't understand that point?  You think that bank legal

16   departments and bankers identify every particular account when

17   they set a policy about how to handle accounts generally?

18         MR. SLODOV:  No, Your Honor, that wasn't my

19   confusion.  My confusion comes from the way that the term is

20   defined in the request for production.  I understand what

21   you're saying, but with respect to the response in this

22   particular context where the term was specifically defined and

23   limited to the plaintiff's account scheduled on --

24         THE COURT:  It says "responsibilities in connection

25   with the account."  So if there's a general memo that says, we

1  deal with the following accounts the following way, obviously

2  that subsumes this particular account.  It doesn't have to say,

3  this is how you deal with the rights and responsibilities of

4  Ms. Anderson's account.  If a bank did that --

5              MR. SLODOV:  I'll draw your --

6              THE COURT:  -- its shareholders should sue them.

7              MR. SLODOV:  I'll draw your attention to Document

8  Number 33-1 that was filed on February 5th, 2015, and on Page

9  2, the term "account" is defined to mean "the account

10 associated with the bank credit card that is" --

11             THE COURT:  I'm sorry.  You know what?  If you're

12 going to make this argument, I will entertain a motion for

13 sanctions.  This is the stupidest argument I've heard in a long

14 time.

15             Let me interrupt for a second.

16       (Court and court personnel confer.)

17             THE COURT:  Sorry, I had to talk to somebody who came

18 in late.

19             I mean, that really is putting blinders on.  And if

20 that's how you're approaching this discovery, you better stop.

21 You're smarter than that, I know it.

22             MR. SLODOV:  I appreciate that, Your Honor, and I

23 will endeavor to satisfy the Court's concerns, as well as

24 Mr. Zipes's.

25             THE COURT:  Okay.

1          MR. SLODOV:  I just wanted to add I haven't --

2          THE COURT:  This is different than an instruction

3  that says between the bank and all third-party purchasers.

4  That, I understood --

5          MR. SLODOV:  The document --

6          THE COURT:  That, I understood your point.  I

7  understood your point on that.  But this one just doesn't --

8  there's no point here on this one.  Obviously, something in

9  connection with the account would include something that covers

10 these accounts generally and would apply to this account, this

11 particular account.  It would fall within --

12         MR. SLODOV:  I appreciate --

13         THE COURT:  -- how the bank generally deals with

14 accounts.  The very document I was given doesn't say this

15 document applies only to Mr. Anderson's account.  It's a policy

16 manual.

17         Okay.  So was there more on request number five?

18         MR. ZIPES:  No, Your Honor.

19         THE COURT:  Okay.

20         MR. ZIPES:  Your Honor, I'll try to wrap this up.  We

21 had a disagreement about redactions and --

22         THE COURT:  On the pricing issues.

23         MR. ZIPES:  -- on the pricing issues.  And generally,

24 we didn't share with the Court all the redactions, but there

25 are also signatures on affidavits and policies that have been

1    redacted, and it's our position that we're entitled to those

2    names.  There's a possibility that we would want to examine

3    these people and that it's not necessarily that we are going to

4    do it, but we need names.  They shouldn't be redacted just

5    because they're names of people in the bank.

6         THE COURT:  Okay.  Well, in Credit One's response,

7    they break this basically into two parts.  The first part is

8    that they've redacted private financial information relating to

9    the debtor.  If it is the debtor's own financial -- you don't

10   need the debtor's own private financial information, do you or

11   do you?  I don't know.

12        MR. ZIPES:  Your Honor, we want to make that easy for

13   the banks, and we've gone to debtor's counsel to get

14   authorization to review information of the debtor's.  I agree

15   with the Court that we're probably not focused on that issue,

16   but --

17        THE COURT:  But if the debtor authorizes you to do

18   it, I guess the bank shouldn't have a concern.

19        MR. ZIPES:  And we did that partly just so that we

20   wouldn't have discovery disputes over -- when something's

21   stamped "confidential" or "redacted," we want to know that it's

22   being redacted for --

23        THE COURT:  The right reasons.

24        MR. ZIPES:  Right.

25        THE COURT:  Okay.  And then the other issue is

1 confidential commercial information, which goes to the pricing

2 points, I suppose.  And on that one, if --

3              MR. ZIPES:  We have a protect --

4              THE COURT:  What -- I mean, you have a

5 confidentiality agreement, right?

6              MR. ZIPES:  Exactly, Your Honor, yes.

7              THE COURT:  So how does that work?  I mean, what is

8 the -- this is really going to be a question for Mr. Slodov.

9 How does -- why do you need the extra level of confidentiality

10 if the U.S. Trustee's bound by a confidentiality agreement in

11 the first place?

12              MR. SLODOV:  The basic explanation that I can give

13 you to the -- to respond to your question, Your Honor, is that

14 my client was concerned that these documents will end up in

15 places where they weren't intended to go, and I understand that

16 you've indicated in a past status conference that you intend to

17 require the banks to produce all documents that were produced

18 to the U.S. Trustee to plaintiffs' counsel.  We have yet to

19 work out the terms of a protective order to cover -- in the

20 adversary case, which we're going to be discussing later.  And

21 out of my client's concern, you know, they wanted that

22 information withheld.  That's the long and short of it.

23              THE COURT:  Well, can we --

24              MR. SLODOV:  And --

25              THE COURT:  See, I -- can we talk -- maybe my memory

1  is falling apart, but I don't think I ruled that way as far as

2  what was going to be produced to the plaintiffs.

3        MR. CARPINELLO:  What you said, I think, in the

4  conference was, Your Honor, that they could do it voluntarily,

5  but eventually we should be able to get it pursuant to our own

6  discovery.  I would anticipate that everything that's being

7  talked about today is the kind of information we are going to

8  ask for, so --

9        THE COURT:  Well, you'll ask for it, but at that

10  point -- I mean, if it's being produced to the U.S. Trustee on

11  grounds of confidentiality, I doubt I would say that you could

12  get it if it --

13        MR. CARPINELLO:  Well, we --

14        THE COURT:  -- wasn't confidential, for example.

15        MR. CARPINELLO:  Well, we have -- I don't know if we

16  entered it in the Credit One, but we have a standard

17  confidentiality order.  I think the same rules would apply.  I

18  don't think -- if the information is relevant, I don't think

19  the fact that it's confidential commercial information's a

20  basis to withhold it.

21        THE COURT:  I mean, I -- as I recall our discovery

22  conference, what I said was the bank could provide it

23  voluntarily if they wanted to, in all likelihood, you will be

24  asking for the same stuff, so they should certainly keep it

25  handy and we'll deal with it when it's asked for.

1              MR. CARPINELLO:  That's correct.

2              THE COURT:  So there's no order saying that whatever

3 goes to the U.S. Trustee goes to --

4              MR. CARPINELLO:  No.

5              THE COURT:  -- to the plaintiffs.

6              MR. CARPINELLO:  There is no such order.  But I do

7 want to emphasize that --

8              THE COURT:  You'll be seeking it.  I understand that.

9              MR. CARPINELLO:  Just to pre-stage the issue, I think

10 the same point Mr. Zipes is making is going to apply to us.

11             THE COURT:  Right.

12             MR. CARPINELLO:  I mean, you cannot -- and I think

13 the cases are legion on this -- where there's a confidentiality

14 order in place, and we'll sign the same order that's applied to

15 all the cases.  I don't know if we've signed it yet for Credit

16 One, but you've already got a standard order.  They cannot

17 withhold relevant information on the grounds that it's

18 commercial confidential information --

19             THE COURT:  Well --

20             MR. CARPINELLO:  -- if it's relevant.

21             THE COURT:  -- fine.

22             MR. SLODOV:  Well, that's --

23             THE COURT:  Okay.

24             MR. SLODOV:  -- that does beg the question, though,

25 is it, in fact, relevant.  I mean --

1            MR. CARPINELLO:  Well, we'll deal with it.

2            THE COURT:  Well, but that's a -- again, it's a

3    broader standard on a 2004, and on -- to me, the pricing

4    information generally is an area which would -- may be giving

5    you a foretaste of discovery under the adversary proceeding

6    rules.  It is, in all, likelihood going to be relevant here

7    because the contention is that the debt seller gets a better

8    price, therefore, price being at issue based on the credit

9    reporting.  But as far as 2004 is concerned, you know, if

10   you're doing a Venn diagram, that it's even bigger than that.

11   So I would think it would be producible or required to be

12   produced.

13            We've dealt with this in the past --

14            MR. SLODOV:  To the --

15            THE COURT:  -- as to the confidentiality agreement.

16   This issue came up as far as pricing was concerned, and it was

17   dealt with.  I forget which one or the other issuers did it.

18   Maybe it was GE, I forget, but that's down the road.  As far as

19   the U.S. Trustee, they already have a confidentiality agreement

20   and I think they're entitled to it.  I mean, it's --

21            MR. SLODOV:  Thank you, Judge.

22            THE COURT:  And I think they're entitled to the names

23   of the people.  That's not -- I mean, the U.S. Trustee is not

24   going to go out and hire those people.  They're not looking to

25   poach people that have contracts with Credit One, so I can't

1  imagine why there would be any confidential commercial

2  information there.

3          MR. SLODOV:  Well, Your Honor, if I understand,

4  you're saying that they're entitled to the information, but

5  you're not indicating that it's not entitled to confidential

6  treatment, are you?

7          THE COURT:  Well, the names of the people?

8          MR. SLODOV:  I mean, if it's included in the sale

9  agreement, if the -- if someone -- a signatory to the purchase

10 and sale agreement has their name redacted, you're saying that

11 their name should not be redacted.  I understand that.

12         THE COURT:  Right, right.

13         MR. SLODOV:  But I don't understand what you're

14 saying to mean that that document isn't confidential.

15         THE COURT:  No, I'm saying the person, the name of

16 the person who signed it.

17         MR. SLODOV:  Your Honor --

18         THE COURT:  Assuming that person had authority over

19 negotiating it -- and, you know, obviously, the U.S. Trustee

20 wants to talk to that person.  Maybe he or she knows something

21 -- I mean, you know, I mean, you may want to introduce that

22 person --

23         MR. SLODOV:  I understand that, Your Honor.

24         THE COURT:  -- to say --

25         MR. SLODOV:  I understand that.

1    THE COURT:  -- this had nothing to do with credit --

2  you know, credit reporting, you know, it was the farthest thing

3  from our mind.  It just seems to me it's not commercial

4  confidential information, and they -- so it shouldn't be

5  redacted.

6    MR. SLODOV:  Thank you.

7    THE COURT:  Now, the U.S. Trustee has signed a

8  confidentiality agreement and it's bound by the confidentiality

9  agreement, so I'm not saying they're relieved from that.  And

10  they're the U.S. Trustee, it's not like they're -- they want to

11  do their investigation and they're not in the business of, you

12  know, publishing news articles about people.

13    MR. ZIPES:  And, Your Honor, we do have a problem

14  with the liberal use of this confidentiality sample.  We're not

15  going to make that an issue at the moment.  We'll bring that up

16  at the appropriate time.  We think that it's being used --

17    THE COURT:  Okay.

18    MR. ZIPES:  -- way too often, but --

19    THE COURT:  But I think you've got to conclude your

20  investigation before that's --

21    MR. ZIPES:  Right.

22    THE COURT:  -- may even be worth talking about.

23    MR. ZIPES:  Thank you, Your Honor.

24    THE COURT:  Okay.  So I think we're clear on sort of

25  the ground rules on this.  In the future, I think the parties

1  should, as you have, continue to discuss these things, but just

2  be reasonable over what could be asked legitimately and not

3  force necessarily the U.S. Trustee to file motion after motion

4  to parse through the language.

5        Okay.  So I think that covers everything except the

6  <u>Anderson</u> motions, which are all subsumed in one document, but

7  I've read those pleadings.  And I guess part of the issue is

8  the request to amend the caption and/or amend the order,

9  reopening the case, to add Credit One Financial, but we'll get

10 to that.  But again, I've read the pleadings and I -- but I'm

11 happy to hear oral argument, and I guess that should start with

12 Mr. Slodov.

13       MR. SLODOV:  Thank you, Your Honor.  I know that I'm

14 re-plowing plowed ground that's been plowed over several times,

15 and I had a sense that this is a fait accompli before the

16 proceedings began in light of the preceding cases in <u>Haynes</u> and

17 <u>Echevarria</u> and <u>Belton</u> and <u>Bruce</u>.  And I think that the most

18 logical place to start is at the end, where we ask the Court

19 for a stay pending the outcome of the appeals that are

20 currently pending.  This is different than a stay pending

21 appeal.  The request asks the Court, for the purpose of

22 exercising judicial parsimony, to not address the motion as it

23 has been filed until the Court of Appeals addresses the pending

24 appeals in I believe it was <u>Bruce</u> -- and I forget the name of

25 the other one off top of my head.

1        The rationale for the request is that if it turns out

2   that the Court of Appeals agrees with the Court on the scope of

3   what is and what is not a core or non-core, whether the Court

4   does have jurisdiction, and whether the Court was correct in

5   denying the motion to stay and compel arbitration in light of

6   the MBNA case, that will dictate the outcome of Credit One's

7   motion.  We're the last to come before the Court.

8        THE COURT:  Well, legally, though it would only

9   dictate it for the plaintiffs if they lose, right, under

10  collateral estoppel principles, collateral estoppel wouldn't

11  apply to you.  There would be -- there would obviously be stare

12  decisis.

13       MR. SLODOV:  I don't think collateral estoppel would

14  apply to either of us in -- no matter what the outcome --

15       THE COURT:  Well, there's the same issue, and the

16  defendant and the plaintiffs would party to both.  It would

17  apply to the plaintiff, but I don't see how it would apply to

18  you.

19       MR. SLODOV:  The purpose of the request to stay is to

20  allow the Court to wait for a ruling on an issue that is

21  pending in front of the Court.  This issue, the -- whether or

22  not a claim for a violation of the discharge injunction is

23  something that should or should not be referred to arbitration

24  is pending on appeal before the Second Circuit and on facts

25  that are similar, but they don't involve the same parties.

1              THE COURT:  Well --

2              MR. SLODOV:  If the Court of Appeals were to rule

3    that the Court was incorrect, that ruling would inform the

4    Court as to how to proceed on Credit One's motion.  If the

5    Court of Appeals agrees with this -- Your Honor's ruling in the

6    prior cases, it will dictate the outcome of Credit One's

7    motion.

8              THE COURT:  It won't dictate it as a matter of law,

9    though, right?

10             MR. SLODOV:  Correct.  It'll inform it.

11             THE COURT:  Just based on principles of stare

12   decisis.

13             MR. SLODOV:  Correct.

14             THE COURT:  And if you read the recent Supreme Court

15   argument on the <u>Dewsnup</u> case, several justices of the Supreme

16   Court have some issues with stare decisis.  So I'm -- you know,

17   I have, as most judges have, sometimes waited on a ruling when

18   something is on appeal or -- not on appeal, where I know that

19   the Second Circuit or the Supreme Court is about to rule on an

20   issue, but here, to me, since it's already briefed, it's

21   already reviewed, I don't see why there's any reason not to

22   rule.

23             MR. SLODOV:  That's your -- that's entirely up to

24   your discretion, Your Honor.

25             THE COURT:  Okay.

**WWW.ACCESSTRANSCRIPTS.COM**

1          MR. SLODOV:  That's all.  I wanted to start at the

2    end because it seemed like if -- we didn't need to address the

3    merits of the motion if the Court was willing to stay --

4          THE COURT:  Okay.

5          MR. SLODOV:  -- and it doesn't appear that the Court

6    is.

7          THE COURT:  And, you know --

8          MR. SLODOV:  So we'll --

9          THE COURT:  -- and as suggested by a couple of

10   parties today, you know, there may well be an outcome in the --

11   in other adversaries that raise the same or similar issues that

12   doesn't result in any decision on appeal.  I -- it may be

13   settled, so I --

14         MR. SLODOV:  Yeah.  They may end up withdrawing the

15   appeals, right.

16         THE COURT:  -- I just -- to me, it -- this is not a

17   case where I know that something's sub judice that it's going

18   to ruled on, so I -- I'm not going to exercise my discretion to

19   stay at -- under these circumstances given that it's fully

20   briefed and fully reviewed and -- you know, I just don't see

21   any really telling reason, even under principles of a judicial

22   economy, not to deal with this and it is before me.

23         MR. SLODOV:  Thank you, Your Honor.

24         So turning to the first issue that was briefed was

25   the motion to compel arbitration.  There's no dispute that

1  there is an agreement to arbitrate, but it's a broad agreement

2  that clearly covers the type of claim that's being made here

3  concerning credit reporting error and issues associated with

4  credit reporting.  It's also relatively clear from the

5  agreement that it was within the contemplation of the parties

6  that the consumer might file bankruptcy because there is a

7  reference to claims made through the account holder, including

8  a trustee in bankruptcy, and there's also a survivable --

9  survivor paragraph -- survivability paragraph that makes it

10 clear that the arbitration agreement survives in the event of a

11 bankruptcy.

12           I don't believe that the plaintiff disputes that

13 there is, in fact, a valid agreement to arbitrate or that the

14 scope of the agreement covers the claims that are being made

15 here.  I think that the biggest area that we likely clash with

16 the Court on is congressional intent.  And on that score, while

17 I appreciate the Court's thoughtful method of addressing the

18 issue of congressional intent as it applies to the relief

19 that's provided by 524, it's our position, with all due

20 respect, that because Congress has not seen fit to give

21 bankrupt debtors a private right of action for a violation of

22 the discharge injunction, and the specific conduct which is

23 claimed to have been in violation of the discharge injunction

24 is specifically addressed by Congress in 15 U.S.C. Section

25 1681s-2(a), and there is no private right of action under

1  s-2(A) either that it can't be said that Congress intended that

2  claims such as these, like the plaintiffs in this case, should

3  not be heard in arbitration.

4       And the second point I want to make on this is, Your

5  Honor, that the plaintiff's claim individually is undeniably a

6  core claim, but with respect to the putative class claims that

7  he's bringing, I think it's equally well-established that it is

8  not -- those claims for the putative class are not core claims.

9  They can't be.  And you can tell me why I am wrong on that, but

10  I don't see how a non-debtor absent putative class member's

11  claim for an alleged violation of the discharge injunction that

12  occurred in Ohio or Nevada or California could be a core claim

13  in this proceeding.  And because of that, because the class

14  claims themselves are non-core, there is no discretion and

15  those case -- those claims have to be compelled to arbitration

16  per the MBNA decision.

17       THE COURT:  Okay.  On the agreement itself, am I

18  right -- and I'm looking at the language quoted on Page 9 of

19  the motion -- that there's -- the initial filing fee would have

20  to be paid by the debtor and there's no assurance that there

21  will be any reimbursement for payment of the cost of the

22  arbitration?

23       MR. SLODOV:  As to the last part of your question,

24  Your Honor, the cost -- it -- the way I read this provision,

25  for cost, it says that the prevailing party gets their costs,

1 and it does provide that the bank will advance if the

2 administrator determines there is good reason for requiring the

3 bank to do so or the bank determines that there is good cause

4 for doing so.

5           THE COURT:  Uh-huh.  But it says you will file -- if

6 you file the arbitration, you will pay the initial filing fee

7 unless you seek and qualify --

8           MR. SLODOV:  That's what --

9           THE COURT:  -- for a fee waiver.

10           MR. SLODOV:  Right, but I think that the fourth

11 sentence down where it begins however --

12           THE COURT:  Right.  It's within the --

13           MR. SLODOV:  -- says, we will advance --

14           THE COURT:  If the administrator or the lender

15 determines there's a basis for doing so.  And the -- each party

16 --

17           MR. SLODOV:  And on that point --

18           THE COURT:  -- each party will bear the -- and then

19 each party will bear the expense of that party's attorneys,

20 experts and witnesses and other expenses regardless of which

21 party prevails, except the arbitrator shall apply any

22 applicable law in determining whether a party should recover

23 any or all expenses from another party.  There's no other

24 provision dealing with costs and expenses and fees?

25           MR. SLODOV:  For the arbitration, Your Honor?

1          THE COURT:  Yes.

2          MR. SLODOV:  I believe you're correct.

3          THE COURT:  Okay.  All right.  Is there any provision

4   that acknowledges the ability to get injunctive relief,

5   including preliminary injunctive relief?

6          MR. SLODOV:  I believe that depends on the selection

7   of the arbitrator, and if I'm not mistaken, there were three --

8   initially three options, but they limited those to AAA and JAMS

9   after an amendment, and I'm fairly sure that under both sets of

10  procedures, injunctive relief is a potential remedy that an

11  arbitrator can award.  I suppose in some respects, that depends

12  on the nature of the arbitration that's selected.  I know that

13  the rules are different depending on whether you're talking

14  about consumer or commercial disputes, but generally speaking,

15  Your Honor, I'm fairly certain that both AAA and JAMS have

16  procedures for injunctive relief -- for obtaining injunctive

17  relief during an arbitration.  And I say that based on my

18  recollection, not based on anything that I've looked at

19  recently.

20          THE COURT:  Okay.

21          MR. SLODOV:  It's been a while since I've studied up

22  on the specifics of the arbitration rule, but from what I

23  recall, they do provide for equitable relief.

24          THE COURT:  Okay.

25          MR. SLODOV:  I think it's worthwhile also to point

42

1 out, since we're talking about the terms of the agreement

2 itself, that I don't think there's any dispute either that the

3 plaintiff agreed to pursue his claims on a individual basis and

4 that he would not pursue them on a class basis.

5         THE COURT:  Right.

6         MR. SLODOV:  I think that probably goes to the motion

7 to strike more so than, you know, the motion to compel, but if

8 you're contemplating whether or not, you know, class

9 arbitration is possible, under the terms of the agreement,

10 Mr. Anderson agreed that he wouldn't pursue a class

11 arbitration.

12         THE COURT:  Okay.  Is there any recognition --

13 express recognition in the arbitration agreement of a right to

14 equitable relief or injunctive relief or to seek equitable

15 relief or injunctive relief other than -- separate and apart

16 from incorporating whatever rules might apply under the AAA or

17 other regime for arbitration?

18         MR. SLODOV:  I don't believe so, Your Honor.  I think

19 that the operative language is the procedure and law applicable

20 in arbitration paragraph on Page 9 that refers to the

21 applicable procedure and rules of the arbitration unless

22 they're inconsistent with procedures and rules -- or I'm trying

23 to read -- yeah, the -- I think it's the third sentence down.

24 The arbitration will be conducted under the applicable

25 procedures and rules of the arbitration administrator that are

1  in effect on the date the arbitration is filed.

2          THE COURT:  Right.

3          MR. SLODOV:  So if those procedures are, in fact,

4  available under the AAA or under JAMS, then they would be

5  available to the plaintiff.

6          THE COURT:  Unless those rules are inconsistent with

7  the procedures and rules under this agreement, which would

8  apply to the class action, excluding him obviously to the

9  extent that they would be under JAMS or AAA any sort of

10  class-action relief, which I'm skeptical of, but -- okay.

11          The -- I've read the plaintiff's response on this,

12  but do you have anything further to say on this point -- on

13  these points on arbitration?

14          MR. CARPINELLO:  I don't think so, Your Honor.  I

15  think the -- you've already addressed all the issues about the

16  barriers that debtors face in terms of having to bring an

17  arbitration and front the fee and hire an attorney.  And I will

18  just simply reiterate that in some of the other cases where you

19  denied arbitration, it was an express provision in the

20  agreement allowing for injunctive relief.  There is none here.

21          And in the other cases, there was also a prohibition

22  of arbitration of class-action cases, and nonetheless you held

23  that there should be no -- this case should not be stayed in

24  favor of arbitration.  And for -- we just reiterate all the

25  reasons that Your Honor has denied similar requests in the

1  other cases.

2          THE COURT:  Okay.

3          MR. CARPINELLO:  Thank you.

4          THE COURT:  All right.

5          MR. SLODOV:  Your Honor, could I respond just

6  briefly?

7          THE COURT:  Sure.

8          MR. SLODOV:  I read through all the transcripts in

9  <u>Bruce</u> and <u>Echevarria</u> and <u>Belton</u> and <u>Haynes</u>, and the one thing

10 that I didn't see the Court address, and I grazed it earlier,

11 is the question of how it's possible that a putative class

12 claim becomes a core claim.  I don't understand how that's

13 possible.

14         THE COURT:  Well, it's dealt with actually in the

15 <u>Haynes</u> opinion, I believe.  It's --

16         MR. SLODOV:  I think the Court addressed --

17         THE COURT:  -- to enforce a right under Section

18 524(a) and 105(a) of the Bankruptcy Code, which specifically

19 applies to enforcing rights under Section 524.  It arises under

20 the Bankruptcy Code.  Therefore, the fact that there's no

21 estate is completely irrelevant since the discharge under

22 Section 524 and 727 are statutory provisions that Congress

23 enacted so that creditors would be precluded from pursuing

24 interest on claims against debtors after they are discharged.

25         And the statement that there's no private right of

1  action under 524 is essentially a red herring because the

2  courts have clearly recognized that there is a cause of action

3  to enforce the discharge as within the bankruptcy court's

4  authority to enforce a specific code provision, including

5  Section 524, see In re Nosek, 544 F.3d 44 (1st Cir. 2008),

6  which states that the Court has its own contempt power, as well

7  as power under Section 105(a).

8          So this is really addressed in the Haynes opinion,

9  2014 WL 3608891 (Bankr. S.D.N.Y., July 22, 2014), which

10  addresses the class action issue.  It's not separately

11  addressed in the arbitration decision, which is Belton, 2014 WL

12  5819586, In Re Belton (Bankr. S.D.N.Y., November 10, 2014).

13         But, you know, as I noted in Belton, nothing is more

14  core to bankruptcy, particularly an individual's bankruptcy,

15  than getting his or her discharge and making it work.  And I

16  think you acknowledged that the Court has power to enforce a

17  discharge and award sanctions for failure to do so, as well as

18  issue an order compelling performance or withholding or ceasing

19  the violation of the discharge.  And the power to do that is

20  under 105(a), as well as the Court's general contempt power.

21         So to me the private cause of action point is really

22  a red herring and ignores the jurisdictional structure of the

23  code, which in 1334(b) states that the district courts have

24  jurisdiction over claims arising in and arising under and

25  related to the bankruptcy code and case, and then that

46

1  jurisdiction is conferred on the bankruptcy court with respect

2  to core matters.

3        Under 157 as far as -- 157(a) and (b) as far as

4  arising in and arising under, this clearly arises under the

5  code.  There's nothing more central to the Bankruptcy Code than

6  524 and 727, and 105(a) --

7        MR. SLODOV:  Your Honor, the --

8        THE COURT:  -- specifically gives authority to

9  enforce that, and it's not limited to the Court's own specific

10 jurisdiction, but it's to enforcing provisions of the

11 Bankruptcy Code, which is what Congress chose to do.  I'm

12 assuming it chose to do that as opposed to just saying follow

13 the All Writs Act because it conferred on bankruptcy courts the

14 power to enforce the Bankruptcy Code, and that encompasses

15 class actions specifically --

16       MR. SLODOV:  Your Honor, if I --

17       THE COURT:  -- as set forth in Rule 7023.

18       MR. SLODOV:  If I could interject one point.  I just

19 wanted to make the observation that what I'm referring to is

20 congressional intent.  And in construct -- in construing

21 whether to compel arbitration or not, the Court's required to

22 consider whether or not Congress has indicated an intent to

23 preclude waiver of judicial remedies for the statutory right.

24       THE COURT:  Well, okay.

25       MR. SLODOV:  And --

**WWW.ACCESSTRANSCRIPTS.COM**

1         THE COURT:  And this is your FCRA argument?

2         MR. SLODOV:  No, Your Honor.

3         THE COURT:  Okay.

4         MR. SLODOV:  I was trying to point out that if I

5    understand the Court --

6         THE COURT:  Because the -- you know, the Second

7    Circuit in the Simon case says that the FCRA doesn't really

8    apply in bankruptcy cases anyway because bankruptcy is special,

9    In re Simon.  But anyway, I'm sorry I interrupted you.

10        MR. SLODOV:  I'm sorry, Your Honor.

11        As I understood what the Court held in Belton, that

12   under MBNA v. Hill, the Court's required to make a

13   determination particularly as to inquiry into the nature of the

14   claims and the facts of the specific bankruptcy to ascertain

15   whether or not that intent is evident -- congressional intent,

16   that is.  And under MBNA v. Hill, the question as I read MBNA

17   v. Hill turns on the distinction between what's core and what's

18   non-core.

19        And my point was, Your Honor, that with respect to

20   absent putative class members, their claims, relative to

21   Mr. Anderson, have to be considered non-core.  I don't

22   understand how you can reach the conclusion despite everything

23   you've said, and I don't disagree with the fact that the Court

24   has, you know, authority to enforce the discharge order, impose

25   sanctions, you know, for contempt as it pertains to the debtor.

48

1  My issue here is how do you get to that -- from that to a claim

2  of absent class members and finding them to be core claims

3  because if they're non-core claims, per MBNA v. Hill, the Court

4  doesn't have discretion and has to refer those claims to

5  arbitration.

6          THE COURT:  But --

7          MR. SLODOV:  That's the point that I was trying to

8  make.

9          THE COURT:  Okay.  But I -- I'll say this one more

10 time.  They are debtors, too.  They also got a discharge.  They

11 got a discharge under the Bankruptcy Code, specific provisions

12 of the Bankruptcy Code, 11 U.S.C. 524 and 727.

13         Consequently, I believe under 28 U.S.C. Sections

14 157(a) through (b) and 1334, those claims which arise under the

15 Bankruptcy Code, those rights to enforce the discharge which

16 arise under the Bankruptcy Code, i.e. 524 and 727, Congress

17 specifically provided that the bankruptcy court has core

18 jurisdiction.

19         And it's more than, you know, the items listed in

20 (b)(2).  This is like fundamentally core.  There's nothing more

21 fundamental than the discharge, as every court that has

22 considered this issue has ruled.  And I think I may have left

23 out in the Belton decision In re Norman, 2006 Bankr. LEXIS 2576

24 (Bankr. M.D. Ala. 2006), which ruled the same way.  So it just

25 -- it's at 157(b)(1).  It's right there.  Arising under Title

49

1  11.  They separately say arising in, so it's not limited to the

2  case.  It's arising under Title 11.

3         As far as congressional intent is concerned, I have

4  to believe that Congress still thinks that debtors who have

5  actually earned the discharge, the honest but unfortunate

6  debtor, should not be put to having to come up with the cost to

7  initiate an arbitration in front of non-judges, which as I said

8  in an aside in <u>Belton</u> is completely contradictory to the

9  Supreme Court's case law under -- or the reading of the Supreme

10 Court's case law under <u>Stern</u>, but maybe we'll get an answer to

11 that in the <u>Wellness</u> decision where at least two or three of

12 the justices have a hard time with arbitration under the logic

13 of <u>Wellness</u>.

14        But it -- this one, I think you're right.  You're not

15 going to win on this one.  And except to the extent I've

16 supplemented on the record here, I'll rely on the logic in

17 <u>Belton</u>.  And that includes on this point, as far as the other

18 debtors, i.e. the putative class debtors, the analysis in

19 <u>Haynes</u>, which makes clear I think, as Judge Isgur did, as well,

20 in the <u>Cano</u> case that I cited, that Section 105 is in

21 furtherance of the and in addition to the Court's contempt

22 powers and, by its own terms, provides for enforcement of

23 individual provisions of the Bankruptcy Code, which are --

24 clearly include Section 524 and 527.  So maybe we should move

25 on off of arbitration.

1          I do think that the agreement here differs somewhat

2    from the agreement in Belton, but in fact differs in a way that

3    is not helpful to the cause of arbitration in that it would

4    have someone who's just gone through a Chapter 7 bankruptcy.

5    And if it's supposed to work right, and I believe it does work

6    right in this district and elsewhere, the debtor is basically

7    left with his or her income, whatever that is going forward,

8    and exempt assets and nothing else.

9          So Congress clearly has stated by MBNA v. Hill, put a

10   premium on the debtor's fresh start, and it's hard for me to

11   believe that Congress, where there was an allegation that the

12   discharge is being violated, would so jeopardize the fresh

13   start as to require the debtor to shell out the cost of an

14   arbitration and leave it up to the arbitrator and/or the good

15   graces of the credit card company to shift that cost to the

16   credit card company.

17          I also have concerns that there's no express

18   acknowledgment of equitable relief or injunctive relief.  The

19   primary relief being sought here is to stop the allegedly

20   improper violation of the discharge, and as I discussed in

21   Belton, that power is at best hazy and time consuming if one

22   goes the arbitration route even when there is an express

23   acknowledgment of injunctive and equitable remedies in the

24   agreement.

25          So I believe that in this -- with regard to these

1   types of causative action, I should agree with the other courts

2   that have held that arbitration was not intended by Congress

3   when a violation of a discharge was at issue and whether that's

4   for an individual debtor before the court in the case before

5   the court -- that is the Chapter 7 case before the court -- or

6   debtors generally.  Congress recognized a class action remedy,

7   and in the jurisdictional sections that I've quoted, gave the

8   Court the power to enforce the code generally.  So maybe we

9   should turn to the next issue.

10          MR. SLODOV:  Thank you, Your Honor.

11          The next issue that was briefed is the motion to

12  dismiss for improper venue.  A number of the courts have

13  likened or analogized the arbitration agreement itself as a

14  forum selection clause, and when a case is filed in court as

15  opposed to an arbitration, it's considered to be in the wrong

16  venue.

17          THE COURT:  But this is --

18          MR. SLODOV:  And --

19          THE COURT:  There's no specific venue selection

20  provision here.  It's really just premised on the arbitration

21  provision, right?

22          MR. SLODOV:  Yes.

23          THE COURT:  So if I conclude that arbitration doesn't

24  apply, logically I should conclude that this argument doesn't

25  hold water either.

1          MR. SLODOV:  Well, there's no disagreement that there

2    is a -- an arbitration agreement that provides for arbitration

3    to be done in AAA or JAMS.  That's not the issue.  That -- nor

4    is it the issue that an arbitration agreement is a form of

5    forum selection clause.  So the forum that was selected by the

6    party creates the proper venue in arbitration and --

7          THE COURT:  But if I conclude that Congress did not

8    permit the parties to select arbitration, doesn't that

9    short-circuit the argument?  I mean, in Judge Bookwell's case,

10   Orlando v. Staples, she says it's a kind of forum selection

11   clause, but then she says arbitration isn't appropriate here,

12   so 12(b)(3) won't apply.

13         MR. SLODOV:  Well, I can move on if you'd like.

14         THE COURT:  Okay.  Oh, no.

15         Do you have anything more to say on that,

16   Mr. Carpinello?

17         MR. CARPINELLO:  No, Your Honor.

18         THE COURT:  Okay.  I mean, I also think that this

19   issue really has also separately been dealt with.  It's been

20   dealt with by some of the courts that actually have separate

21   forum selection provisions as opposed to just an arbitration

22   provision, and I -- you know, they're circuit court cases, but

23   I believe that the case law there is consistent with the case

24   law that I've just cited where the general FAA precedent

25   controls.  So, for example --

1          MR. SLODOV:  Well, Your Honor --

2          THE COURT:  -- in the <u>Spillman</u> -- sorry?

3          MR. SLODOV:  I was just going to say that with

4   respect to this argument, the only basis that I understand that

5   the plaintiff could demonstrate that venue is improper or that

6   the Court should deny the motion is to show that enforcement

7   would be unreasonable or unjust.  And that's the way I

8   understand the case is if there's going to be an argument that

9   the agreement shouldn't be enforced, it has to be based on a

10  showing that it would be unreasonable or unjust on the

11  circumstance, and plaintiff hasn't met his burden here.

12          THE COURT:  I don't think that's where the case law

13  is.  See <u>In Re Spillman Development Group Limited</u>, 710 F.3d

14  299, 306 (5th Cir. 2013), which relies upon one of the key

15  cases that I relied on on the FAA, which was <u>In re National</u>

16  <u>Gypsum Company</u>, 118 F.3d 1056, 1068 (5th Cir. 1997).  So I

17  think we should move on after this one.  I mean, I --

18          MR. SLODOV:  Okay.

19          THE COURT:  Another case dealing with the same issues

20  is -- in the bankruptcy context is the <u>PHH</u> case, <u>Rescap</u>

21  <u>Liquidating Trust v. PHH Mortgage Corp.</u>, 518 B.R. 529, 268

22  (S.D.N.Y. 2014), which talk about forum selection clauses and

23  their relation to the core matters and where it's tied to the

24  core matter.

25          Everyone agrees that the forum selection clause won't

1  apply, although other courts have somewhat of a balancing test.

2  But if you're dealing with something as fundamentally core as

3  the discharge, I don't think it really matters what approach

4  you take.  You would -- under PHH, you wouldn't do it.

5          MR. SLODOV:  Next portion of the motion, Your Honor,

6  is the motion to strike the class allegations.  I think there

7  were two arguments on this point, the first being that

8  Mr. Anderson waived his right to pursue a class claim, and the

9  second being that the -- there's a precedent that establishes

10  that if it's clear from the face of the complaint that there's

11  no reasonable way the class could be certified as it's pled,

12  that the class allegation could be stricken.  And here we've

13  argued that the claim is time barred to the extent that it's

14  asking for relief back to May 3rd, 2007.  There are generally

15  three parts to this arguments.

16          In the first case, Mr. Anderson's discharge wasn't

17  entered until May of 2014.  He wouldn't have a cause of action

18  prior to that.

19          Second, that if the statutory injunction is the basis

20  of the plaintiff's claim, then there's a statutory statute of

21  limitations that applies to it whether it is 28 U.S.C. 1658 or

22  analogous state law.

23          And third, if the basis of his claim is that an order

24  was violated, the only order that was entered here was his and

25  this Court doesn't have authority to enforce any other court's

1  order, but to the extent that the court is going to allow the

2  plaintiff to do that, that laches would bar any claim prior to

3  Credit One having notice that it was required to delete a trade

4  line associated with a sold account after a bankruptcy was

5  filed because that amounts to collection activity.

6          THE COURT:  Well, on the latter point, there are

7  cases going back into the '90s saying that, in fact, it's the

8  law, but -- and certainly going back to 2006, I already cited

9  one, In re Norman, as well as cases in this jurisdiction from

10  2007, In re Torres and In re Russell.

11          But as far as the other points are concerned, how

12  does 28 U.S.C. Section 1658 apply here?  I was having a very

13  hard time seeing that.  I understand it would apply to criminal

14  contempt arguably, but that's not what we're talking about

15  here.  We're talking about, I think, civil contempt.

16          MR. SLODOV:  Well, first of all, that's a good

17  question.  The plaintiff is seeking both damages and punitive

18  damages, and the only way to get punitive damages in a case is

19  if there's been a showing in a contempt case of a criminal

20  contempt.  I don't believe that punitive damages are available

21  short of anything other than a criminal contempt, and I haven't

22  found any bankruptcy cases that suggest otherwise.

23          THE COURT:  Well --

24          MR. SLODOV:  Maybe I didn't look hard enough.

25          THE COURT:  There are bankruptcy cases that award

1  punitive damages that don't talk about criminal contempt.  For

2  example, <u>In re Adams</u>, 2011 U.S. Dist. LEXIS 158090 (E.D.N.C.

3  January 24, 2011).  The law is less clear in the Second

4  Circuit, I think, not as to whether it's criminal or punitive,

5  but rather whether the appropriate sanction for civil contempt

6  should be limited to remedial and compensatory sanctions.

7           But are you looking for punitive damages?

8           MR. CARPINELLO:  Yes, Your Honor, we are.

9           THE COURT:  You are.

10          MR. CARPINELLO:  We are looking for punitive damages.

11          THE COURT:  Okay.  All right.

12          MR. CARPINELLO:  I can address the issue.

13          THE COURT:  Okay.  So why don't you address the issue

14  then.

15          MR. CARPINELLO:  I think there are a number of cases

16  in the Second Circuit that say a Court can award punitive

17  damages as part of civil contempt.  Even the cases he cites in

18  his reply brief, which by the way he omitted from his opening

19  brief, support this position.  He cites cases from other

20  circuits, nothing in the Second Circuit, that say a court can

21  award as part of civil contempt a punitive damage award.

22          We're not seeking imprisonment here.  You know, I

23  think the appropriate time to determine what's the appropriate

24  punitive damages isn't the time that the Court decides whether

25  it wants to award punitive damages.  But as I say, there are

1  innumerable cases, and if he had raised it in his opening

2  brief, I would have cited them that show that the Court does

3  have the power to award punitive damages.

4          THE COURT:  But in any event, you're not looking for

5  only punitive damages.

6          MR. CARPINELLO:  No.  We're also looking for

7  compensatory damages and attorneys' fees and injunctive relief

8  and declaratory relief.  But I think his argument is that --

9  well, I'm not sure what his argument is.  But as far as 1658

10  goes, the case law and even the case he cites is very clear

11  that it only applies to statutes or statutory amendments on

12  which the party -- the plaintiff is relying and that were

13  passed after that statute.

14          The fifth -- 524 was enacted in 1978, predated 1658.

15  So by -- it's clear by its terms and by the Supreme Court case

16  -- I think it was <u>Jones</u> that he cites -- that statute of

17  limitations doesn't apply.  Even if a statute of limitation

18  applied to a contempt of court, which we don't -- we cite some

19  case law from the Second Circuit that he doesn't respond to

20  that says it doesn't.

21          THE COURT:  Okay.  Well, on the punitive damages

22  point, the -- as I said, courts in other districts, without

23  discussing whether they're criminal or not -- and I think given

24  the bankruptcy court's jurisdiction, the assumption from their

25  lack of discussion is that they do not believe it's criminal

1  since bankruptcy court jurisdiction doesn't really apply to

2  criminal matters -- have recognized punitive damages.

3         In addition to the case I cited from the district

4  court in North Carolina, see In re Russell, 378 B.R.

5  735,744(Bankr. E.D.N.Y. 2007) and In Re Digeronimo, 354 B.R.

6  625, 644 (Bankr. E.D.N.Y. 2006).

7         Judge Gropper in In re Nassoko says that at least

8  some courts have found that they could be awarded for a

9  violation of a discharge injunction if the respondent's actions

10 are sufficiently egregious, 405 B.R. 515, 526, Note 8 (Bankr.

11 S.D.N.Y. 2009).

12         To me this is an issue that is better left for the

13 future and certainly not a basis for dismissing the complaint,

14 which seeks other relief -- the class-action portion of the

15 complaint, that is, which seeks relief, and primary relief for

16 that matter, in addition to its request for punitive damages.

17 As far as the statute of limitations is concerned --

18         MR. SLODOV:  Your Honor, could I point out something

19 on that?

20         THE COURT:  Okay.

21         MR. SLODOV:  It's on the statute of limitations.

22         THE COURT:  Sure.

23         MR. SLODOV:  I just wanted to circle back and address

24 one point, and that is you asked the question of why 1658

25 applies.  I think there are actually two statute of limitations

1  that I cited that apply to potential contempts.  There's one

2  for criminal contempts, which is a five-year statute, and the

3  four-year general statute of limitations applies to civil

4  actions, 1658.  Those were cited in the reply.

5          I also wanted to mention that -- let me back up.  The

6  five-year statute --

7          THE COURT:  I'm sorry, the four-year general statute

8  found where?

9          MR. SLODOV:  It's at 28 U.S.C. 1658.

10          THE COURT:  Okay.

11          MR. SLODOV:  It applies to acts of Congress amended

12  or enacted -- or reenacted after 1990, and I pointed out in the

13  reply that 524 was amended three times after 1990 --

14          THE COURT:  But not --

15          MR. SLODOV:  -- as well as was --

16          THE COURT:  -- but not this section, right?

17          MR. SLODOV:  -- 105.

18          THE COURT:  But this section?  I mean, 524 is a long

19  provision.

20          MR. SLODOV:  Yeah.  Your Honor, I -- to be honest

21  with you, the plaintiff was a week late in filing their --

22          MR. CARPINELLO:  Yeah, we were.

23          MR. SLODOV:  -- opposition brief, which gave me no

24  time to put together the reply.

25          THE COURT:  Well, but --

1          MR. SLODOV:  I filed a -- I cited the three --

2          THE COURT:  -- what I'm asking you now is the

3 particular section we're talking about, the basic discharge

4 section, how has that been amended?

5          MR. SLODOV:  524(a), I don't believe that it was

6 covered by the amendments.

7          THE COURT:  All right.  Okay.

8          MR. CARPINELLO:  May I respond to the timeliness

9 of --

10          THE COURT:  The law's out there.  I've researched it.

11 I have a copy of the 1978 code.  I have a copy of the 2005

12 code.  I have a copy of the 1984 code.  You can see the

13 changes.  It -- I just -- I don't believe that 1658 applies

14 here.

15          MR. SLODOV:  In that respect, Your Honor, the

16 analogous state law applicable to a claim for a violation of

17 524 would be New York Civil Practice Law Section either 2154 or

18 24 -- 21 -- sorry, I'm misspeaking.  It's 215(4) or 214(2).

19 They provide respectively a one-year or a three-year statute of

20 limitations for statutory violation.

21          THE COURT:  Well, doesn't even New York recognize

22 that there's no statute of limitations for civil contempt

23 claims?

24          MR. SLODOV:  If the claim is premised on an order,

25 correct, but those claims are --

1          THE COURT:  Well, if you're --

2          MR. SLODOV:  -- subject to laches.

3          THE COURT:  -- if you're going by analogy here,

4   wouldn't you do the same thing?  And that's all you would do

5   anyway to apply the state statute of limitations.

6          MR. SLODOV:  The presumption is that if there is a

7   statute that is subject to a statute of limitation defense.

8          THE COURT:  Right, which doesn't exist here --

9          MR. SLODOV:  And --

10         THE COURT:  -- even under New York law.

11         MR. SLODOV:  And in that case, you -- in that case,

12  you borrow from closest analogous state law.

13         THE COURT:  No, but even under New York law, you

14  wouldn't have it.  I -- it just -- again --

15         MR. SLODOV:  Well, plaintiff's --

16         THE COURT:  I mean, I understand that you may well be

17  able to argue in the future, including on class certification,

18  that there may be defenses of laches or some other equitable

19  defense for these older claims, but to say that I should import

20  a statute of limitations from New York where you -- New York

21  doesn't have a statute of limitations on civil contempt is

22  really stretching it.

23         MR. SLODOV:  Your Honor, the problem is is that the

24  plaintiff's position on this changes depending on when it's

25  convenient for them.  It's --

1           THE COURT:  No.  But by analogy, this is like civil

2   contempt, and the only reason you apply the state -- you borrow

3   the state limitation period is if -- is by analogy.

4           MR. SLODOV:  If the plaintiff's claim in this case is

5   premised on a statute of Congress that provides for damages,

6   then it's subject to the closest analogous state law statute of

7   limitations.  There is -- I have a --

8           THE COURT:  But the closest analogous state law

9   statute of limitations is the lack of one for civil contempt.

10          MR. SLODOV:  It's not the remedy, Your Honor.

11          THE COURT:  That's the most analogous thing here.

12          MR. SLODOV:  Actually, Your Honor, if what the

13  plaintiff is attempting to do is enforce court orders from

14  throughout the country, I might agree with you --

15          THE COURT:  But how -- but what is the other --

16          MR. SLODOV:  -- but that's not what the plaintiff is

17  trying to do here.

18          THE COURT:  But what is the other --

19          MR. SLODOV:  The plaintiff is trying to enforce a

20  statute that was enacted by Congress, which is 11 U.S.C. 524,

21  and this Court's -- asked the Court to use its authority under

22  105 to issue sanctions.

23          THE COURT:  But the order is under 524 and 105, so

24  again the analogy here is one where the New York courts,

25  including see In re Hay Foundry and Iron Works, 47 N.Y.S. 802,

1 | 805 (App. Div. 1897).  That can't be right, 1897.  Oh, I'm
2 | sorry, I'll give you a more recent one.  <u>Goodman v. Goodman</u>,
3 | 202 N.Y.S.2d 897, 898 (1959) and 21 N.Y. Jurist 2d contempt
4 | (phonetic), Section 123.  It just -- to me, it doesn't -- I
5 | know you're --
6 |             MR. SLODOV:  Your Honor, I'm just --
7 |             THE COURT:  -- I know you're making a distinction
8 | between enforcing my order and enforcing the discharge, but the
9 | discharge is an order and it -- and 524 gives the Court the
10 | power to enforce it, so I just -- I don't think you import it
11 | here.
12 |             MR. SLODOV:  In that respect --
13 |             THE COURT:  I think you --
14 |             MR. SLODOV:  Okay.
15 |             THE COURT:  Again, you can raise laches issues, and
16 | that may be a way to take people out of the class, but I don't
17 | think the whole thing gets dismissed over that.
18 |             MR. SLODOV:  The last point, Your Honor, is that even
19 | if this is a court order under 18 U.S.C. 3282, there's a
20 | five-year statute of limitations for criminal contempts.  And
21 | if the Court is contemplating imposing and the plaintiff is
22 | requesting punitive damages, it's our position that, in fact,
23 | whether they've said it or not, they're asking for a criminal
24 | contempt finding, which we're, you know, entitled to prove
25 | beyond a reasonable doubt and all the intended protections that

64

1  a contemnor is entitled to if they're being pursued for

2  criminal contempt.

3          THE COURT:  Well, but -- I thought I'd already ruled

4  on that point.  The basis for awarding punitive damages for

5  violation of the discharge is unclear.  Some courts say you

6  can't do it at all as a bankruptcy court.  Some courts say you

7  can where there are egregious circumstances and don't analyze

8  the underlying jurisdictional basis, whether it's criminal or

9  not.

10          And I'm not prepared to rule out punitive damages

11  claims at this stage of the case without that issue being

12  briefed and there being facts before me in the first place to

13  even justify it.  It may well be that ultimately that aspect of

14  the claim would be dismissed or I wouldn't find the egregious

15  circumstances in the first place, but it doesn't seem to me to

16  be a basis to dismiss the entire class action.

17          MR. SLODOV:  Well, Your Honor, this is just going to

18  come up in terms of discovery.  We're going to have a problem

19  because we're going to be -- it's our position that the claims

20  are subject to a statute of limitations and we're going to have

21  to address it at some point, so --

22          THE COURT:  But you're going to -- the discovery will

23  cover the other claims, too.  It's the same facts.

24          MR. SLODOV:  With the scope of discovery, Your Honor.

25          THE COURT:  I'm not prepared to do it today.

1          MR. SLODOV:  Would you like me to move on?

2          THE COURT:  Yes.

3          MR. SLODOV:  With respect to the fourth argument that

4   was raised, it goes to the Court's jurisdiction and the

5   statement of claim.

6          First argument was that Credit One Financial should

7   be dismissed because leave to add them as a party was not

8   obtained.  On that point I did want to add one observation, and

9   that is that on the three -- two excerpts of credit reports

10  that were attached to the motion to reopen, the creditor listed

11  on the trade line is Credit One Bank.

12         Now, there can't be any argument that the entity

13  responsible for placing the trade line on the credit report is

14  Credit One Financial when the entity that listed the trade line

15  is Credit One Bank and Credit One Bank is a party.

16         THE COURT:  Okay.  Well, I looked at the order

17  reopening the case, and it does refer to only against Credit

18  One, Credit One Bank.  It seems to me that if I'm going to have

19  the Credit One Financial entity be a defendant here, you need

20  to reopen the case to let them be a defendant.

21         MR. CARPINELLO:  Well, we will do that, Your Honor.

22  I guess the question is whether it's a futile exercise or when

23  that will likely be granted.  I think --

24         THE COURT:  Well, I don't know.  I don't know what

25  the facts that you're going to allege are.

1           MR. CARPINELLO:  We don't -- and we don't know what

2   they are either until we get some discovery.

3           THE COURT:  Okay.

4           MR. CARPINELLO:  We do -- the position we take with

5   this is the same we took with Bank of America, and that is

6   separate and apart from who's on the credit agreement.  The

7   question is who's making the policy decisions, and these are

8   closely-held companies, and as we typically see, the -- they --

9   they've got officers or employees at one entity, which is

10  dictating exactly what to do at the other entity.

11          THE COURT:  Well --

12          MR. CARPINELLO:  They're not true --

13          THE COURT:  -- if they're dictating what Credit One

14  Bank does, you'll get that in discovery because it -- you'll

15  get it -- it's related to Credit One Bank.  So I guess I'm not

16  -- that's all I can say at this point.  You know, I --

17          MR. CARPINELLO:  Fair enough.  I just don't want to

18  be met with the argument by Mr. Slodov, we're not going to

19  produce discovery from Financial because they're not a party,

20  they're a third party, and --

21          THE COURT:  Well, you're entitled to third-party

22  discovery, too.

23          MR. CARPINELLO:  And that the argument that they're

24  not a party shouldn't be a basis not to get their documents as

25  it relates to relevant issues in this case --

1          THE COURT:  Well, we'll --

2          MR. CARPINELLO:  -- because I anticipate we're going

3  to --

4          THE COURT:  -- we'll deal with that when it comes

5  down the road, but I think this aspect of the motion should be

6  granted.

7          MR. CARPINELLO:  Understood, Your Honor.

8          THE COURT:  You know, with -- obviously, you can move

9  later if facts warrant to reopen the case, but it wasn't

10  reopened to permit suit of Credit One Financial, so that aspect

11  of the motion's granted.

12          MR. SLODOV:  Thank you, Your Honor.

13          THE COURT:  Okay.

14          MR. SLODOV:  As to the subject matter to entertain an

15  adversary for violation of discharge injunction, I think that

16  ground's been plowed well enough, and I understand the Court's

17  view on it.

18          THE COURT:  Right.

19          MR. SLODOV:  And I did drop a footnote and I believe

20  plaintiff's counsel highlighted the fact that, you know, we

21  have to preserve the issue for appeal, so --

22          THE COURT:  Right.  Just for the record --

23          MR. SLODOV:  -- there is contrary authority from the

24  circuit court.

25          THE COURT:  Just for the record, my view is that Rule

1    7001 lays out what must be brought by an adversary proceeding,

2    that adversary proceedings provide more procedural protection

3    for defendants than contested matters.  Bankruptcy rules

4    contemplated applying the adversary proceeding rules to

5    contested matters where appropriate, and the case law, I

6    believe, including the <u>Kalikow</u> case, acknowledges that --

7    except for the Ninth Circuit case which is cited, which I

8    disagree with, and I believe the law in this circuit and this

9    district is contrary to that.

10          When the debtor is seeking to pursue rights such as

11   this, he or she can do so or it can do so by adversary

12   proceeding as opposed to contested matter.  And, in fact, it's

13   the -- it avoids what I would have done here if anyone had

14   asked, and I'm sure people would have asked, which is to apply

15   the adversary proceeding rules to a contested matter.  That's

16   unnecessary at this point.  See <u>In re Motichko</u>, 395 B.R. 25, 32

17   to 33 (Bankr. N.D. Ohio 2008) and <u>In re Texaco</u>, 182 B.R. 937

18   (Bankr. S.D.N.Y. 1995).  And I think a close reading of the

19   <u>Kalikow</u> case is not to the contrary.

20          Okay.  I know there were other arguments made, also.

21          MR. SLODOV:  There were.  Two more, but if we're of

22   limited time, I'll just limit my argument to the last point,

23   which was that the complaint failed to state a claim.  And the

24   only additional fact I'd like to point out is that the term

25   charge-off that appears on the credit report is a term -- as

1    the Court's pointed out, it's reviewed by people in the real

2    world that look at credit applications and make credit

3    decisions.  They're not bankers.  I'm sorry, they're not

4    lawyers.  They don't rely on Colliers for a definition of what

5    charge-off means.  And they would -- a reasonable reading of

6    the word "charge-off" would rely on the ordinary meaning of the

7    term, which is simply that it was eliminated from the books of

8    an account, that it was deemed worthless.

9           The fact is that Mr. Anderson's credit report was

10   accurate in May of 2012 when Credit One sold its account.  It

11   was accurate in May of 2013 when it said it had a zero balance,

12   that the account was charged off.  It was, in fact, accurate as

13   of the date that he got his discharge, and it didn't become

14   inaccurate, according to the plaintiff, until he got the

15   discharge.  So unless the term was infused with a different

16   meaning after he got his discharge in May of 2014, it couldn't

17   have become inaccurate simply by virtue of the discharge.

18          THE COURT:  Well --

19          MR. SLODOV:  And --

20          THE COURT:  -- isn't there a different meaning?

21          MR. SLODOV:  To who?

22          THE COURT:  To anyone.  Let me ask you --

23          MR. SLODOV:  Of the word charge-off?

24          THE COURT:  Well, let me -- I mean, I've asked this

25   of the other defendants.  Let me ask you, too.  Does your

1  client take the view that when it writes down on a credit

2  report and has it -- and it's on a credit report after a

3  discharge of a debt that it still has, that it hasn't sold but

4  it's after the discharge, charged off, that means that it has

5  no legal right to collect the debt on an in personam basis?

6          MR. SLODOV:  I don't believe that's the same, no.  I

7  don't see that as being the operative meaning of the term

8  charge-off.

9          THE COURT:  And right, charge-off doesn't mean that.

10 It means that --

11         MR. SLODOV:  No.

12         THE COURT:  -- there is no legal bar to collecting

13 the debt, right?

14         MR. SLODOV:  Well, it signifies -- as I understand

15 the term, Your Honor, it signifies that the creditor deems the

16 file account -- the paper worthless because they have no

17 prospect for recovery on it.

18         THE COURT:  No practical prospect, right?  But --

19         MR. SLODOV:  Correct, right.

20         THE COURT:  -- a legal matter it can.  As a legal

21 matter it could, right?

22         MR. SLODOV:  Well, so could a discharged debt.

23         THE COURT:  If the debtor won the lottery the next

24 day, Credit One could collect that debt, right, under that

25 rubric.  That's what people understand when they read it.

1              MR. SLODOV:  Sure, but even if he had filed for --

2              THE COURT:  Okay.  And -- well, let's just stop

3   there.

4              MR. SLODOV:  -- bankruptcy protection then --

5              THE COURT:  If it's discharged, Credit One couldn't

6   collect the debt, right?

7              MR. SLODOV:  No, that's not true.  They could still

8   ask him --

9              THE COURT:  Oh, you really think that if the debtor

10  got it discharged, won the lottery the next day, Capital One

11  could collect the debt?

12             MR. SLODOV:  They could file a claim --

13             THE COURT:  No.  It's gotten --

14             MR. SLODOV:  -- in the bankruptcy case.

15             THE COURT:  Debtor's gotten a discharge.

16             MR. SLODOV:  Couldn't they file a claim?

17             THE COURT:  No, the debtor's gotten a discharge.

18             MR. SLODOV:  What if he bought his lottery ticket

19  before he filed for bankruptcy?

20             THE COURT:  That's not --

21             MR. SLODOV:  Isn't that an asset of the estate?

22             THE COURT:  -- the fact pattern I gave you.

23             MR. SLODOV:  I agree.

24             THE COURT:  You're trying to change the facts.  So

25  there is a legal distinction, a fundamental one.

72

1        MR. SLODOV:  It depends.  It depends is what I would
2   say, Your Honor.

3        THE COURT:  Depends on what?

4        MR. SLODOV:  To answer your question point blank, the
5   designation on a credit report of charge-off does not signify
6   that the bank has a bar, a legal bar to trying to collect the
7   debt in the future.

8        THE COURT:  Okay.  All right.  So there is a
9   discharge or treated in bankruptcy does, right?  That's the
10  distinction.

11       MR. SLODOV:  Included in bankruptcy, Your Honor,
12  could be a designation that's included in a Chapter 13 plan,
13  which means that the debtor's plan might, for example,
14  contemplate paying the credit card company some money as part
15  of the plan.  So it doesn't mean that the bank isn't recovering
16  by virtue of the fact that it says included in bankruptcy.
17  It --

18       THE COURT:  You know, this argument has worked with a
19  few courts who I don't think understand the difference between
20  discharge and in rem rights.  It doesn't work as a matter of
21  law or logic.  It just doesn't.

22       MR. SLODOV:  But the logic, Your Honor, the way I
23  read your opinions is that it flows from the designation of
24  charge-off.  All the parade of horribles that debtors face as a
25  result of information appearing on their credit report --

1           THE COURT:  If you will concede for your client for

2  purposes of judicial estoppel in all cases where your client is

3  a creditor that wherever your client lists charged off, it

4  means discharged, I'll accept it, I think, if you'll concede

5  that.  I'll put it in the order, send it to every bankruptcy

6  court in the country, and they will know that they have

7  accepted that that debt has been discharged.

8           MR. SLODOV:  I think, Your Honor, I've stated that it

9  doesn't mean that.

10          THE COURT:  Okay.

11          MR. SLODOV:  So I couldn't stipulate to that.

12          THE COURT:  End of story as far as I'm concerned.

13  You're saying something means something, X means Y.  It

14  doesn't.  Y means Y and X means X.  I don't buy it, and the

15  courts that did are -- you know, shame on them.  They didn't

16  think hard enough or maybe the lawyers weren't good enough to

17  point out the fact to them of the difference, but they're in

18  the distinct minority.

19          MR. SLODOV:  Well, I would like to actually hear from

20  plaintiff if he would agree with me that the credit reporting

21  was accurate up until the discharge was entered.

22          THE COURT:  It doesn't matter.  That's not what

23  they're -- that's not what the complaint's about.  It's the

24  post credit -- it's the post discharge that the complaint is

25  about.

1          MR. SLODOV:  But doesn't that mean that the bank had

2  to do something in addition to what it had done two years

3  prior?  I mean, if I understand the logic that is laid out in

4  these -- this line of cases, accurate credit reporting becomes

5  inaccurate by virtue of the credit reporting that has to be

6  fixed.  Otherwise, it amounts to collection activity.  And from

7  my point of view, that's illogical because if it's accurate

8  before the bankruptcy's filed and when the bankruptcy is

9  pending and it's accurate up until the day the discharge is

10 entered, it's accurate the day after, too.  And that act of not

11 changing it does --

12          THE COURT:  All right.  Let me pose to you a

13 hypothetical, all right?

14          MR. SLODOV:  Yeah.

15          THE COURT:  Let's assume there's no bankruptcy at

16 all.  Time one --

17          MR. SLODOV:  Okay.

18          THE COURT:  -- Capital One reports a debt as being

19 due and owing and outstanding.  It's accurate at that time.

20 Time two, debtor pays the debt.  Capital One continues to

21 report it due and outstanding.  It was accurate, now it isn't.

22 How is that any different from reporting accurately that it was

23 due and owing on an in personam basis until the discharge, but

24 after the discharge being inaccurate because it still says it's

25 due and owing on an in personam basis?  Same logic.

1          MR. SLODOV:  The first fallacy in the analogy, Your

2    Honor, is that a charge-off is not the same as saying that the

3    money is due and owing.

4          THE COURT:  We've been through that.  We've been

5    through that and you lost on that --

6          MR. SLODOV:  Okay.

7          THE COURT:  -- and you will always lose on it because

8    the -- again, X mean X and Y means Y.  Charge-off does not mean

9    discharge.

10         MR. SLODOV:  Here the credit report says zero is due

11   and owing.  It says nothing is due and owing.

12         THE COURT:  No.  You've lost on that.  All right?

13   And with good reason.

14         MR. SLODOV:  Well, I guess the distinction --

15         THE COURT:  So if that's the basis for this argument

16   -- I thought the argument was somehow that, you know, because

17   it was accurate once, it's always accurate.  But if we're just

18   plowing the old ground, we should move on.

19         MR. SLODOV:  I guess the only distinction, Your

20   Honor, is that there's no payment in your analogy.

21         THE COURT:  Oh, you've -- they've been relieved of

22   payment.  In a way it's even worse because the way it's being

23   reported now, it's as if they hadn't been relieved of payment,

24   and so the person reading the credit report who knows they've

25   been in bankruptcy is going to assume their discharge was

1  denied.  And we all know that the reason discharges are denied
2  is because you're not the honest but unfortunate debtor, you're
3  the dishonest debtor.  That is really ugly.
4          MR. SLODOV:  I don't know that that's a --
5          THE COURT:  That's really ugly.
6          MR. SLODOV:  I don't know that that's a -- I don't
7  know that that's a fact that you can judicially notice, Your
8  Honor.  I don't see that it's part of the record, and I don't
9  think that the evidence will bear that out.
10          THE COURT:  It's a matter of law.  Read 727 and 523.
11  Those are the bases for denial of discharge generally and
12  denial of discharge of a particular debt, and they're all ugly
13  -- fraud, theft, embezzlement.  So in essence the statement
14  that we don't think we're going to collect anything from this
15  person -- and by the way, they've been in bankruptcy but they
16  haven't gotten a discharge -- is about as bad as you can get.
17          MR. SLODOV:  We'll have the facts and we'll let the
18  facts say what they say.  I mean, I don't agree with you, Your
19  Honor.  I don't think that --
20          THE COURT:  Well, that's a different point.  That's
21  not a motion to dismiss.  That's a trial --
22          MR. SLODOV:  I agree with you.
23          THE COURT:  -- for summary judgment.
24          MR. SLODOV:  I understand.  I understand.
25          THE COURT:  But I can certainly take judicial notice

1  of the Bankruptcy Code.  I don't -- it's not even judicial

2  notice.  It's just the code.

3          MR. SLODOV:  Well, you're making the leap in logic

4  from the word "charge-off" on a credit report for a debtor who

5  filed and obtained a discharge and drawing the inference from

6  that that it means that the debt's still owed even though it

7  says zero and that a banker would infer that the debt was, you

8  know, still due and owing because it means that the discharge

9  was denied because he's a bad guy.

10          THE COURT:  Well, if he's gone through bankruptcy --

11          MR. SLODOV:  You know --

12          THE COURT:  -- which is going to be on the credit

13  report, that's exactly what you'd infer.

14          MR. SLODOV:  Why would you infer that?

15          THE COURT:  Because it doesn't say it's been

16  discharged.  It says it's zero balance.

17          MR. SLODOV:  I would think that the public records

18  say that a discharge was granted, but --

19          THE COURT:  But the credit report --

20          MR. SLODOV:  -- maybe I'm wrong about that.

21          THE COURT:  -- is the credit report.  That's what

22  they look at, at least according to the complaint.  Let me ask

23  this:  Why won't they change it?  If we're going to be asking

24  probing questions, why won't they change it?

25          MR. SLODOV:  It's their position that it was accurate

1   when it was reported and plaintiff called --

2           THE COURT:  When it was reported.

3           MR. SLODOV:  -- and never --

4           THE COURT:  What if it's not accurate now?  Why won't

5   they change it?  If it really means the same thing, why won't

6   they change it?

7           MR. SLODOV:  I think it's because under the Fair

8   Credit Reporting Act, they're obligated to report information

9   accurately, and they've done that and they're not as a matter

10  of policy simply going to remove derogatory information that

11  appears on somebody's credit report merely by virtue of the

12  fact that they filed for bankruptcy.  They don't get

13  preferential treatment, you know.  If I defaulted on my --

14          THE COURT:  And you're -- you -- are you --

15          MR. SLODOV:  If I default on my loan --

16          THE COURT:  You have not really answered this

17  question, and I really do want an answer for this.  This is

18  important, so think carefully about this.  When Capital -- I'm

19  sorry, when Credit One put zero balance charged off on a credit

20  report of a debt, is its view that that is the same as a legal

21  matter as a discharge?  So in essence that debt should be

22  viewed as having been discharged in bankruptcy?

23          MR. SLODOV:  The one salient fact that you left out,

24  Your Honor --

25          THE COURT:  Yes or no?

1          MR. SLODOV:  -- they all --

2          THE COURT:  Yes or no?

3          MR. SLODOV:  No.

4          THE COURT:  All right.

5          MR. SLODOV:  Because you left out the essential fact

6    that the account was sold.  The fact that they sold --

7          THE COURT:  That's not -- that's the next step in

8    your analysis, that you're not responsible after it's been

9    sold, but I want to focus on the first step of your analysis,

10   which is that zero balance charged off is accurate and it's the

11   same as a discharge, and we now have the answer.  No.  So let's

12   move to the next question which is how does the sale affect it.

13         MR. SLODOV:  They have no right to enforce it after

14   it's sold.

15         THE COURT:  Okay.  And that's -- the complaint says

16   that your client has a continuing interest in the debt after

17   it's sold --

18         MR. SLODOV:  I understand that.

19         THE COURT:  -- and is enforcing it --

20         MR. SLODOV:  I understand.

21         THE COURT:  -- and is continuing to enforce it and is

22   listed as the creditor.

23         MR. SLODOV:  Well, conspicuously absent from the

24   complaint, Your Honor, is any mention of the fact that

25   Mr. Anderson paid nothing and wasn't subject to any

1 enforcement.

2          THE COURT:  That's right.  Okay.  All right.  So to

3 me, the last point here, which is the fact of the sale, does

4 not require dismissal of the complaint at this time given the

5 allegations in the complaint as far as the, at least,

6 allegation that Credit One maintains a continuing interest in

7 the debt both in terms of economics as well as servicing.

8 We'll find that out in discovery, I guess.  And also the issue

9 as to the pricing of the debt and whether any commitment or

10 understanding as far as not reporting accurately the discharge

11 has increased the price of the debt.

12          In addition to the cases that I cited in <u>Haynes</u> and

13 <u>Belton</u> on this point, I would also like to cite <u>In re Small</u>,

14 2011 Bankr. LEXIS 1868 (Bankr. E.D.K.Y. May 13, 2011), where

15 the Court citing much of the case law says a coercive motive

16 may be inferred from a refusal to correct a credit report,

17 which of course was the point in <u>Torres</u> and numerous other

18 cases, i.e. why not just do it, it's easy enough.  Or at least

19 make a clean break with your buyer so the debtor knows who to

20 contact to say, fix my credit report.  You know, at some

21 point --

22          MR. SLODOV:  Your Honor --

23          THE COURT:  -- it just -- that inference is real and

24 certainly should be drawn at a time for a motion to dismiss.

25          MR. SLODOV:  I believe the way that Congress

1  envisioned this would work, Your Honor, is that they would

2  contact the credit reporting agencies, and in turn the credit

3  reporting agencies would contact the banks, but I understand

4  this isn't a Fair Credit Reporting Act case --

5           THE COURT:  No.

6           MR. SLODOV:  -- and I understand your point that

7  there were -- they should not have to do this at all.

8           THE COURT:  Right.  They shouldn't.

9           MR. SLODOV:  So --

10          THE COURT:  They really shouldn't.  You know, banks

11  -- I --

12          MR. SLODOV:  And I will --

13          THE COURT:  -- banks sue people and refer them to the

14  U.S. Attorney for publicly -- for fraud, for filing false

15  documents in public.  They do that all the time in bankruptcy

16  cases, banks do that.  They know the consequences of false

17  reporting in bankruptcy cases, at least those who prosecute do.

18  Maybe those who defend should pay a little attention to their

19  brothers across the aisle in the next office.

20          MR. SLODOV:  Your Honor, I do have a heart, and I

21  will be talking to my client about the position that was taken

22  earlier in the call by Chase and Bank of America.  So with that

23  said, I'll submit I have nothing further.

24          THE COURT:  Okay.  I think that's right.  I denied

25  all the relief except the dismissal of the claim against the

82

1  other -- what's the name of the other --

2         MR. SLODOV:  Credit One Financial.

3         THE COURT:  Credit One Financial.  You should talk to

4  Mr. Carpinello about who's going to draft the order.  Probably

5  the plaintiff should since it's denying most of the relief.

6         MR. CARPINELLO:  We'll do so, Your Honor.

7         THE COURT:  Whoever drafts it should circulate it to

8  the other side and then email it to chambers with a copy to the

9  other side.  You don't need to formally settle the order on

10  any, you know, set day's notice.  It's just to review to see if

11  it's consistent with the ruling.

12         MR. SLODOV:  And I did have a question about the

13  mechanics of getting a transcript.  Know who I get in touch

14  with?

15         THE COURT:  My -- one of my clerks can give you that

16  information or the person upstairs.

17         MR. SLODOV:  Okay.

18         THE COURT:  Now, you asked for a stay at the

19  beginning.  I mean, just as a preview, I have been prepared to

20  stay matters in these cases pending appeal of the arbitration

21  ruling if the parties were prepared to do what GE did, and what

22  GE did rather quickly and fairly easily.  So before making a

23  motion requesting a stay, you may want to talk to

24  Mr. Carpinello about that, too.

25         MR. SLODOV:  Understood.

83

1             THE COURT:  Okay.  All right.

2             MR. SLODOV:  I actually believe that that issue was

3   raised in his response --

4             THE COURT:  Well --

5             MR. SLODOV:  -- in opposition, and I think we already

6   said --

7             THE COURT:  I think it --

8             MR. SLODOV:  -- it wouldn't be, but I will go back --

9             THE COURT:  -- it seemed to get melded into the

10  notion of staying everything in the first place, but it's --

11            MR. SLODOV:  Right.

12            THE COURT:  -- it's odd to brief a motion for a stay

13  before the ruling, so I'd like to see the actual motion if

14  you're going to do it, but I could certainly sign a consent

15  order also if you don't want to go through the motion along the

16  lines of the order in the GE matter.

17            MR. SLODOV:  Understood.

18            THE COURT:  All right.  Okay.

19            MR. SLODOV:  Thank you, Your Honor.

20            THE COURT:  Thanks.

21       (Concluded at 1:08 p.m.)

22                      * * * * *

23

24

84

<u>**C E R T I F I C A T I O N**</u>

1

2

3        I, Alicia Jarrett, court approved transcriber,

4  certify that the foregoing is a correct transcript from the

5  official electronic sound recording of the proceedings in the

6  above-entitled matter, and to the best of my ability.

7

8

9

10

11

12

13                                DATE:  May 6, 2015

14  ALICIA JARRETT, AAERT NO. 428

15  ACCESS TRANSCRIPTS, LLC

16

17

18

19

20

21

22

23

24

25

85

1                    **C E R T I F I C A T I O N**

2

3          I, Lisa Luciano, court-approved transcriber, hereby

4   certify that the foregoing is a correct transcript from the

5   official electronic sound recording of the proceedings in the

6   above-entitled matter.

7

8

9   _____

10  LISA LUCIANO, AAERT NO. 327     DATE:  May 6, 2015

11  ACCESS TRANSCRIPTS, LLC

12

13

14

15                   **C E R T I F I C A T I O N**

16

17         I, Ilene Watson, court-approved transcriber, hereby

18  certify that the foregoing is a correct transcript from the

19  official electronic sound recording of the proceedings in the

20  above-entitled matter.

21

22

23  _____

24  ILENE WATSON, AAERT NO. 447     DATE:  May 6, 2015

25  ACCESS TRANSCRIPTS, LLC

**WWW.ACCESSTRANSCRIPTS.COM**